# HALE *v.* HENKEL.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 340. Argued January 4, 5, 1906.—Decided March 12, 1906.

Under the practice in this country the examination of witnesses by a Federal grand jury need not be preceded by a presentment or formal indictment, but the grand jury may proceed, either upon their own knowledge or upon examination of witnesses, to inquire whether a crime cognizable by the court has been committed, and if so they may indict upon such evidence. In summoning witnesses it is sufficient to apprise them of the names of the parties with respect to whom they will be called to testify without indicating the nature of the charge against them, or laying a basis by a formal indictment.

The examination of a witness before a grand jury is a "proceeding" within the meaning of the proviso to the general appropriation act of 1903, that no person shall be prosecuted on account of anything which he may testify in any proceeding under the Anti-trust Law. The word should receive as wide a construction as is necessary to protect the witness in his disclosures.

The interdiction of the Fifth Amendment operates only where a witness is asked to incriminate himself, and does not apply if the criminality is taken away. A witness is not excused from testifying before a grand jury under a statute which provides for immunity, because he may not be able, if subsequently indicted, to procure the evidence necessary to maintain his plea. The law takes no account of the practical difficulty which a party may have in procuring his testimony.

A witness cannot refuse to testify before a Federal grand jury in face of a Federal statute granting immunity from prosecution as to matters sworn to, because the immunity does not extend to prosecutions in a state court. In granting immunity the only danger to be guarded against is one within the same jurisdiction and under the same sovereignty.

The benefits of the Fifth Amendment are exclusively for a witness compelled to testify against himself in a criminal case, and he cannot set them up on behalf of any other person or individual, or of a corporation of which he is an officer or employé.

A witness who cannot avail himself of the Fifth Amendment as to oral testimony, because of a statute granting him immunity from prosecution, cannot set it up as against the production of books and papers, as the same statute would equally grant him immunity in respect to matters proved thereby.

The search and seizure clause of the Fourth Amendment was not intended to interfere with the power of courts to compel the production upon a trial of documentary evidence through a *subpœna duces tecum.*

While an individual may lawfully refuse to answer incriminating questions unless protected by an immunity statute, a corporation is a creature of the State, and there is a reserved right in the legislature to investigate its contracts and find out whether it has exceeded its powers.

There is a clear distinction between an individual and a corporation, and the latter, being a creature of the State, has not the constitutional right to refuse to submit its books and papers for an examination at the suit of the State; and an officer of a corporation which is charged with criminal violation of a statute cannot plead the criminality of the corporation as a refusal to produce its books.

Franchises of a corporation chartered by a State are, so far as they involve questions of interstate commerce, exercised in subordination to the power of Congress to regulate such commerce; and while Congress may not have general visitatorial power over state corporations, its powers in vindication of its own laws are the same as if the corporation had been created by an act of Congress.

A corporation is but an association of individuals with a distinct name and legal entity, and in organizing itself as a collective body it waives no appropriate constitutional immunities, and although it cannot refuse to produce its books and papers it is entitled to immunity under the Fourth Amendment against *unreasonable* searches and seizures, and where an examination of its books is not authorized by an act of Congress a *subpœna duces tecum* requiring the production of practically all of its books and papers is as indefensible as a search warrant would be if couched in similar terms.

Although the *subpœna duces tecum* may be too broad in its requisition, where the witness has refused to answer any question, or to produce any books or papers, this objection would not go to the validity of the order committing him for contempt.

THIS was an appeal from a final order of the Circuit Court made June 18, 1905, dismissing a writ of *habeas corpus* and remanding the petitioner Hale to the custody of the marshal.

The proceeding originated in a *subpœna duces tecum,* issued April 28, 1905, commanding Hale to appear before the grand jury at a time and place named, to "testify and give evidence

in a certain action now pending . . . in the Circuit Court of the United States for the Southern District of New York, between the United States of America and the American Tobacco Company and MacAndrews & Forbes Company on the part of the United States, and that you bring with you and produce at the time and place aforesaid":

1. All understandings, agreements, arrangements, or contracts, whether evidenced by correspondence, memoranda, formal agreements, or other writings, between MacAndrews & Forbes Company and six other firms and corporations named, from the date of the organization of the said MacAndrews & Forbes Company.

2. All correspondence by letter or telegram between MacAndrews & Forbes Company and six other firms and corporations.

3. All reports made or accounts rendered by these six companies or corporations to the principal company.

4. Any agreements or contracts or arrangements, however evidenced, between MacAndrews & Forbes Company and the Amsterdam Supply Company or the American Tobacco Company or the Continental Company or the Consolidated Tobacco Company.

5. All letters received by the MacAndrews & Forbes Company since the date of its organization from thirteen other companies named, located in different parts of the United States and also copies of all correspondence with such companies.

Petitioner appeared before the grand jury in obedience to the subpœna, and before being sworn asked to be advised of the nature of the investigation in which he had been summoned; whether under any statute of the United States, and the specific charge, if any had been made, in order that he might learn whether or not the grand jury had any lawful right to make the inquiry, and also that he be furnished with a copy of the complaint, information or proposed indictment upon which they were acting; that he had been informed that there was no action pending in the Circuit Court as stated in the subpœna, and that the grand jury was investigating no specific charge against

any one, and he therefore declined to answer: First, because there was no legal warrant for his examination, and, second, because his answers might tend to incriminate him.

After stating his name, residence and the fact that he was secretary and treasurer of the MacAndrews & Forbes Company, he declined to answer all other questions in regard to the business of the company, its officers, the location of its office, or its agreement or arrangements with other companies. He was thereupon advised by the Assistant District Attorney that this was a proceeding under the Sherman Act to protect trade and commerce against unlawful restraint and monopolies; that under the act of 1903, amendatory thereof, no person could be prosecuted or subjected to any penalty or forfeiture on account of any matter or thing concerning which he might testify or produce documentary evidence in any prosecution under said act, and that he thereby offered and assured appellant immunity from punishment. The witness still persisted in his refusal to answer all questions. He also declined to produce the papers and documents called for in the subpœna:

First. Because it would have been a physical impossibility to have gotten them together within the time allowed.

Second. Because he was advised by counsel that he was under no legal obligations to produce anything called for by the subpœna.

Third. Because they might tend to incriminate him.

Whereupon the grand jury reported the matter to the court, and made a presentment that Hale was in contempt, and that the proper proceedings should be taken. Thereupon all the parties appeared before the Circuit judge, who directed the witness to answer the questions and produce the papers. Appellant still persisting in his refusal, the Circuit judge held him to be in contempt, and committed him to the custody of the marshal until he should answer the questions and produce the papers. A writ of *habeas corpus* was thereupon sued out, and a hearing had before another judge of the same court, who discharged the writ and remanded the petitioner.

*Mr. De Lancey Nicoll,* with whom *Mr. Junius Parker* and *Mr. John D. Lindsay* were on the brief, for appellant in this case and in No. 341 argued simultaneously herewith.[1]

There were no facts authorizing the Circuit Court to entertain any charge against appellant. Unless the grand jury in prosecuting the investigation acted within its jurisdiction, the court had no authority to punish the witness for his supposed contumacy in refusing to answer questions. *People* v. *Cassels,* 5 Hill, 164; *Ex parte Fisk,* 113 U. S. 713; *Scott* v. *McNeal,* 154 U. S. 34; Cooley, Const. Lim. 7th ed. p. 575; *United States* v. *Terry,* 39 Fed. Rep. 355.

No judicial matter was pending in the Circuit Court when appellant was required to attend before the grand jury, or when the orders of May 5 and May 8 were made, in or upon which he could lawfully be required to testify or produce evidence.

Notwithstanding the *subpœna* said "in a certain action," no action was pending; there can be no action, prosecution or criminal proceeding, until after someone has been formally accused of acts constituting a criminal offense by indictment or by information. *Post* v. *United States,* 161 U. S. 583, 587.

Nor was there any particular charge against the corporations named in the *subpœna duces tecum,* or under investigation. The grand jury was merely engaged in an effort to find out whether they had or had not transgressed the Sherman Act.

An *ex parte* investigation, based upon mere suspicion, without any complaint or charge, and that may be without result, is not a "case" or "controversy" within the meaning of the Constitution. *Pacific Railway Commission* v. *Stanford,* 32 Fed. Rep. 241; *Kilbourn* v. *Thompson,* 103 U. S. 168; *Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447.

The grand jury was not in the exercise of its proper and legitimate authority in prosecuting the alleged investigation; consequently its requirement, and the orders of the court, based upon it and the witness's refusal, were *coram non judice* and void.

---

[1] McAlister v. Henkel, *post,* p. 90.

At common law the powers of grand juries were restricted to indictments returned after the examination of witnesses, and presentments made upon their own knowledge or observation.

The former was a written accusation of one or more persons of a crime or misdemeanor, preferred to, and presented upon oath by the grand jury. Blackstone, Bk. IV, c. 23.

The grand jury was continued as a part of our Federal institutions by the Fifth Amendment; but its powers and duties, not being defined by the Constitution or any Federal statute, are only such as grand juries possessed at common law, namely, of considering and acting upon indictments previously framed and laid before them by a known prosecutor, and of presenting facts within their own knowledge. *United States* v. *Mundell,* Iredell, J., 1795, 8 Virginia (6 Call), 245, 247.

No Federal statute authorizes a grand jury to inquire into matters called to their attention by the court or prosecuting attorney, where there is no specific charge against one or more individuals. Such a statute would be unconstitutional, and the idea that a grand jury has practically unlimited inquisitorial power rests, upon various loose and ill-considered utterances in reported cases. 17 Am. & Eng. Ency. 2d ed. 1279.

No case in this country holds that there can be a legitimate inquiry without a previous charge; and except in Tennessee, where there is legislative authority in respect to certain offenses, the idea of general inquisitorial power is repudiated. *Re Lester,* 77 Georgia, 143; *Lewis* v. *Commissioners,* 74 N. Car. 194; *Ward* v. *State,* 2 Missouri, 120. See also *Frisbie* v. *United States,* 157 U. S. 160; *People* v. *Kelly,* 24 N. Y. 74; *O'Hair* v. *People,* 32 Ill. App. 277; *Webster's Case,* 5 Greenleaf, 432; *Post* v. *United States,* 161 U. S. 585; *Beavers* v. *Henkel,* 194. U. S. 73, 84.

Although a grand jury may send for witnesses before indictment actually framed, some specific charge must be pending before them directed against a particular person or persons. *Counselman* v. *Hitchcock,* 142 U. S. 547; *United States* v. *Kilpatrick,* 16 Fed. Rep. 765; *Lloyd* v. *Carpenter,* 3 Pa. L. J. 188.

A grand jury does not possess, and cannot, under the constitution of this State exercise, purely inquisitorial power, because such power is no sense a judicial one.

The greatest evil incident to the Star Chamber was its inquisitorial procedure. Upon suggestion or suspicion citizens were subpœnaed and subjected to examination under the *ex officio* oath. See preamble of act for the abolition of that court (July 5, 1641; 16 Charles I, c. 10; 5 S. R., 110) reciting the violation of the statute of 25 Edw. III. .

To exercise judicial power there must be parties to the proceeding, a matter in controversy, an assertion and a denial; in short, a distinct issue to be determined. Cooley, Const. Lim. 132; *Matter of Pacific Railway Commission* v. *Stanford*, 32 Fed. Rep. 241; *Interstate Com. Com.* v. *Brimson*, 154 U. S. 447.

The theory of our criminal proceeding, like that of Great Britain, is accusatory and not inquisitorial. *United States* v. *James*, 60 Fed. Rep. 257. See opinion of Chief Justice Marshall in *United States* v. *Hill*, 1 Brock. C. C. 159.

Section 1 of the act of February 25, 1903, does not give the petitioner immunity from prosecution, on account of the transactions concerning which he was directed to testify and produce evidence before the grand jury, the investigation before that body not being a "proceeding, suit or prosecution" under either of the acts referred to in the act of February 25, 1903; consequently the petitioner was within the legitimate exercise of his right under the Fifth Amendment of the Constitution, when he refused to testify or produce evidence before the grand jury on the ground that by so doing he might have criminated himself.

The legislative guaranty must have a broad construction in favor of the right which it is intended to secure. *Counselman* v. *Hitchcock*, *supra*.

See also as to similar language in the act of February 11, 1893, *Brown* v. *Walker*, 161 U. S. 591; but the immunity is worthless here unless the language subsequently used, "proceeding, suit or prosecution," embraces a grand jury investigation. If it does not, the witness is deprived of his constitu-

tional rights; any reasonable doubt on this head should be resolved in his favor.

A witness hereafter pleading the immunity afforded by this act as a bar to criminal prosecution will be held to strict proof, especially if he seeks to plead this Federal statute as a bar to a state prosecution. See *Jack* v. *Kansas,* 199 U. S. 372.

An inquiry before a grand jury is not a "suit" nor a "prosecution." *Post* v. *United States, supra; Paul* v. *Virginia,* 148 U. S. 107; *State* v. *Wolcott,* 21 Connecticut, 279; Constitution, Fifth Amendment.

The act of February 25, 1903, is unconstitutional in that it undertakes to deprive the various States of their right and power to prosecute persons concerned in transactions, which violate their own laws, thus infringing upon the provision of the Tenth Amendment. *Brown* v. *Walker, supra,* is against this proposition, but see *Jack* v. *Kansas,* 199 U. S. 372, where it is in effect limited by the improbability only of state prosecution rather than the right of the State to proceed.

The order of May 5 requiring appellant to produce the papers called for in the *subpœna duces tecum* was void under the Fourth Amendment. Its enforcement would amount to the ancient seizure and search which continued by usage in England until the decision of Lord Camden in *Entick* v. *Carrington,* 19 How. St. Tr. 1029. See also *Boyd* v. *United States,* 116 U. S. 616, 626; *Hartranft's Appeal,* 85 Pa. St. 433; *Ex parte Brown,* 72 Missouri, 83; *In re Lester,* 77 Georgia, 143; *In re Morer,* 101 N. W. Rep. 588.

The writ must also particularly describe the papers desired. *Ex parte Brown, supra; Sandford* v. *Nichols,* 13 Massachusetts, 286.

A corporation is entitled to the same immunities as an individual. It cannot be compelled to incriminate itself. Wigmore on Evidence, § 2259; *Logan* v. *Penna. R. R. Co.,* 132 Pa. St. 403; *Santa Clara County* v. *Railroad Company,* 118 U. S. 394; *King of Sicilies* v. *Willcox,* 7 St. Tr. (N. S.) 1049.

By the express provisions of the Sherman Act corporations

are deemed to be persons. Section 8. A corporation can only be examined through its officers, directors or agents. In the present case the Government undertook deliberately by that method to compel the corporation to submit to examination, not as a witness, but by forcing one of its officers and directors to produce its books and papers for the sole purpose of ascertaining whether or not the corporation had committed a crime under the Sherman Act.

The rule that the protection of the Fourth and Fifth Amendments is the personal privilege of the witness and cannot be claimed for the benefit of another has no possible application to the case of an officer, director or agent of a corporation who seeks to secure to the corporation its constitutional rights and immunities; for these rights can only be asserted through its officers, directors and agents.

In this view the witness is not seeking to invoke the privilege of another, but the corporation itself invokes its own privilege in the only manner and by the only means it can employ for that purpose.

If, under these circumstances, it could be said that the corporation was a witness, and, therefore, entitled to the immunity afforded by the statute, this might, perhaps, meet our present contention. But the position of the Government is that the corporation is not protected by the statute. Its avowed purpose is to use the papers as the basis of an indictment against the corporation. See *Davies v. Lincoln National Bank*, 4 N. Y. Suppl. 373; *Rex v. Purnell*, Wilson, 239; *In re Morse*, 101 N. W. Rep. 588.

*Mr. Henry W. Taft*, Special Assistant to The Attorney General, with whom *The Attorney General* and *Mr. Felix H. Levy*, Special Assistant to The Attorney General, were on the brief, for the United States in this case and in No. 341:

The procedure of a grand jury in this country at the time of the enactment of the Fifth Amendment was, and, with unimportant exceptions, has remained quite different from that of

the similar body in England.   Under this procedure the grand jury proceeds, before a bill of indictment is framed, to investigate, at the instance of the court or of their own body or of the district attorney, a suspected or alleged crime and to determine whether it has been committed, and, if so, who committed it. In so doing they exercise broad inquisitorial powers.   The administration of the criminal law in this country necessitates this procedure, and this was clearly within the common law powers of a grand jury in 1791 when the Fifth Amendment was adopted however different the usual practice in England may have been at that time.

The power of a grand jury extends to the broadest kind of an inquisitorial proceeding.   Counsel for appellant have mistaken a radical change of mere procedure for an attempted enlargement of power.   Or if it is a question of power, long before 1791 the American idea prevailed that the State and not the individual is the agency which should start a criminal prosecution; that this was vitally different from the English idea and necessarily involved radical changes in the grand jury system and the extension of its powers; and that it was with reference to such a system and such powers that the Fifth Amendment was adopted.

During the first hundred years of our independence precedents are not numerous and authority for grand jury procedure rests not so much upon adjudications of the courts, as upon practice sanctioned by long usage and general recognition.

As to power of grand jury to find indictments on its own investigations, see lectures delivered by Judge Wilson in 1791 and 1792, Works James Wilson, ed. 1896, p. 213, and charge of Judge Addison, 1791, Common Pleas Court, Fifth Circuit, Addison's Pa. Rep. Appx. 38; but see *Lloyd* v. *Carpenter*, 1845, 5 Penn. L. Jour. 55 and *State* v. *Smith*, 1838, Meigs, 99.

*United States* v. *Mundel* (1795), 8 Virginia (6 Call.), 245, does not support appellant's contention.   Its tendency is the other way.   See also *Ward* v. *State* (1829), 2 Missouri, 120; *State* v. *Freeman* (1842), 13 N. H. 488,

It thus appears that at the date of the adoption of the Fifth Amendment and for fifty years thereafter under the procedure sanctioned by usage and precedent, an American grand jury (1) could proceed in cases other than those in which a private prosecutor presented a duly engrossed indictment, and (2) on its own motion or at the instance of the court or the prosecuting attorney, could (and necessarily by an inquisitorial method) investigate an alleged or suspected crime and after the investigation direct an indictment to be drawn.

The legality of the grand jury, without the agency of the district attorney, calling witnesses, whom they interrogated as to their knowledge concerning a Cuban expedition, was sustained, and the broad inquisitorial powers of grand juries was recognized. See report in note to § 337, Wharton's Crim. Pl. & Pr. 8th ed., and see also the charge delivered by Justice Field to a grand jury in California. 30 Fed. Cas. 994; 2 Sawyer, 667.

The limitations placed by Mr. Justice Field upon the inquisitorial powers of the grand jury do not relate to matters brought to their attention either by the court or by the district attorney, and that they permit a general investigation of a crime upon the "personal knowledge" of a juror, where such knowledge goes no further than to include "facts which tend to show" that a crime has been committed, which, of course, implies the power to call witnesses other than the grand juror having such knowledge. See also United States v. Kimball, 117 Fed. Rep. 156; Frisbie v. United States, 157 U. S. 160; United States v. Reed, 27 Fed. Cas. 737; United States v. Terry, 39 Fed. Rep. 355; United States v. McAvoy, 18 How. Pr. 380.

In the state courts see State v. Terry, 30 Missouri, 368; Ex parte Brown, 72 Missouri, 83; Commonwealth v. Smyth, 11 Cush. 473; State v. Wolcott, 21 Connecticut, 272; State v. Magrath, 44 N. J. L. 227; Blaney v. State, 74 Maryland, 153; People v. Northey, 77 California, 618; McCullough v. Commonwealth, 67 Pa. St. 30; Rowland v. Commonwealth, 82 Pa. St. 405; Thompson and Merriam on Juries, §§ 612, 615; Wharton's Crim. Pl. & Pr. 8th ed. § 338. O'Hair v. People, 32 Ill. App. 277; State

v. *Smith*, Meigs, 99; *Lewis* v. *Board of Commissioners*, 74 N. Car. 194, and *United States* v. *Kilpatrick*, 16 Fed. Rep. 765, distinguished.

A specific charge against a particular person is not necessary to give the grand jury jurisdiction. The English practice of private prosecutors has never prevailed. The grand jury acts on information of the district attorney or from its own knowledge or information otherwise obtained. Thompson and Merriam on Juries, § 609; 1 Bishop's Crim. Pr. § 278; charge of Mr. Justice Field, 30 Fed. Cas. 994; *The King* v. *John Lukens*, 1 Dallas, 7.

In its beginnings the grand jury seems to have been devised as a convenient method to assist itinerant justices in England in detecting crime and punishing it. They seem clearly to have been expected to investigate, and originally they indicted frequently, on mere rumor. See Pollock & Maitland's History of the English Law, vol. 2, pp. 622, 639, for description of the grand jury before the time of Edward I, founded on Bracton and Britton; Bracton, "De Corona," Twiss' ed. vol. 2, c. 22, fol. 143, p. 451; Reeves' History English Law, vol. 1, p. 457; Stephens' History Crim. Law. vol. 1, p. 253; Stubbs' Constitutional History of England, vol. 1, p. 661 *et seq.; Earl of Macclesfield* v. *Starkey* (1684), 10 Howell's State Trials, 1330.

A specific charge involves definiteness. Date and circumstances and the technical accuracy characteristic of an indictment are not. necessary to the exercise of jurisdiction by the grand jury.

A witness could object to answering a question because the proceeding was not properly inaugurated, demand a ruling by the court as to whether under the charge presented the question was admissible; and thus an investigation begun before the grand jury would soon assume the aspect of a trial in court, subverting the whole purpose of the grand jury system and seriously affecting the administration of justice.

If appellant's claim be conceded that a charge be necessary, it must follow that he can object to the admissibility of evidence

on the ground that it is not competent under the charge. But the granting of such a right would necessarily result in a violation of the secrecy of the proceedings of the grand jury and of the rule that a witness has no right to question the regularity of the proceedings of a grand jury. *United States* v. *Brown,* 1 Sawy. 533, Fed. Cas. 14,671; *McGregor* v. *United States,* 134 Fed. Rep. 187; *United States* v. *Cobban,* 127 Fed. Rep. 713; *United States* v. *Farrington,* 5 Fed. Rep. 343; *United States* v. *Ambrose,* 3 Fed. Rep. 283.

The court will assume that the district attorney and the grand jury proceeded in accordance with their sworn duties and in accordance with law. *United States* v. *Terry,* 39 Fed. Rep. 355; *United States* v. *Hunter,* 15 Fed. Rep. 712; *United States* v. *Reed,* 2 Blatchf. 435.

A witness before a grand jury has no right to raise objections as to the constitution of that body, unless his constitutional rights are clearly in danger. *Ex parte Haymond,* 91 California, 545.

No inconvenient or unjust results can attend the adoption of the rule the Government contends for, and sound public policy demands that it be held that the action was properly set in motion in this case.

It was contended below that to concede inquisitorial powers to a grand jury without in every case requiring a specific charge against a particular person would open up under the guise of the administration of justice possibilities of wrong and oppression "beyond conception."

In the many jurisdictions where broader inquisitorial powers exist and have been exercised by grand juries, they have not been used as an engine of oppression. The system is surrounded with such safeguards that the danger of abuses is very remote.

The scope of the powers of a grand jury is limited by the jurisdiction of the court of which it is an appendage. *United States* v. *Hill,* 1 Brock. 156. It is also subject to the direction of the court and cannot effectually exercise some of its most

important functions without the interposition of the court. It must resort to the court to enforce by *subpœna* the attendance of witnesses, and it is only through the order of the court that witnesses may be punished for contumacy. *Commonwealth* v. *Bannon,* 97 Massachusetts, 214; *Heard* v. *Pierce,* 8 Cush. 338. The court may inquire whether the grand jury has exceeded its powers, *People* v. *Naughton,* 7 Abb. U. S. 421, 426; *Denning.* v. *The State,* 22 Arkansas, 131, 132, and may punish the entire jury or any of its members. *Turk* v. *State,* 7 Ohio Pt. II, 240, 243; *State* v. *Cowan,* 1 Head, 280; *Re Ellis,* Hemp. 10. Thus, while the grand jury is an independent body, its independence is confined within well-defined limits.

Whether a cause or action under the title mentioned in the subpœna was pending is unimportant. The proceeding might have proceeded without a title. Titles of proceedings before a grand jury are invariably fictitious. *United States* v. *Reed,* 27 Fed. Cas. 737; *Appeal of Hartranft,* 85 Pa. St. 433.

The Fourth Amendment does not relate to the compulsory production of papers for use as evidence. *Summers* v. *Moseley,* 2 Cr. & M. 477; *Wertheim* v. *Continental R. & T. Co.,* 15 Fed. Rep. 718; *Adams* v. *United States,* 192 U. S. 585; *Interstate Com. Com.* v. *Baird,* 194 U. S. 25; *In re Moser,* 101 N. W. Rep. 591; 1 Greenleaf, Evidence, 16th ed. § 469*a; Boyd* v. *United States,* 116 U. S. 616.

Unreasonableness under the Fourth Amendment cannot be predicated upon either the indefiniteness of the description of the books and papers called for in the subpœna or upon the volume of evidence and the inconvenience in producing it. *United States* v. *Babcock,* 3 Dillon, 567; *In re Storror,* 63 Fed. Rep. 564; *United States* v. *Tilden,* 10 Ben. 566; *In re Mitchell,* 12 Abb. Pr. 249.

It was not for the witness to determine whether the description of the papers was sufficiently definite or the papers themselves material to the inquiry, or whether the production of such a volume of papers was oppressive. He must comply, so far as it was possible, with the terms of the writ and produce the

papers submitting, as he might be advised, any objection to their use in evidence. See note by John D. Lawson, 15 Fed. Rep. 723; see also *Doe* v. *Kelly*, 4 Dowl. 273; *Key* v. *Russell*, 7 Dowl. 693; *Amey* v. *Long*, 9 East, 483; *Holtz* v. *Schmidt*, 2 Jones & Sp. 28; *Bull* v. *Loveland*, 10 Pick. 9; *Chaplain* v. *Briscoe*, 5 Sm. & M. 198; *Corsen* v. *Dubois*, 1 Holt, 239; *Field* v. *Beaumont*, 1 Swanst. 209; *Mitchell's Case*, 12 Abb. Pr. 249; *Doe* v. *Clifford*, 2 C. & K. 448; *In re O'Toole*, 1 Tuck. 39. See also Wigmore on Evidence, § 2200, at page 2979.

Every person subject to the jurisdiction of a competent tribunal is bound to give testimony. This is a "solemn and important duty that every citizen owes to his country." *Ward* v. *State, supra.* He is privileged to decline only in case his answers may tend to criminate him. Our system of jurisprudence does not permit a witness to refuse to answer because he prefers not to or even because his answer will tend to degrade him, except, only, where degrading testimony is interposed solely to affect his credibility. 1 Greenl. on Ev. §§ 454, 455. See cases cited. Where the reason of the privilege ceases the privilege also ceases. Broom's Legal Maxims, 654; *Brown* v. *Walker*, 161 U. S. 597, 599.

The protection of the Fourth and Fifth Amendments is based alone upon the personal privilege of the witness. The objections urged by the witness cannot be relied upon for the benefit of the corporation of which he is an officer, and if the privilege cannot be asserted in behalf of a corporation under the Fifth Amendment it is plain that it may not be so availed of under the Fourth Amendment.

Where the question of criminality is not involved, an officer of a corporation having the books of the company in his custody is bound to produce them in obedience to a *subpœna duces tecum. Wertheim* v. *Continental R'y & Trust Co.*, 15 Fed. Rep. 718. The same rule applies, even though the production of the evidence may tend to incriminate the corporation; one of its officers may not assert in its behalf the privilege secured to persons by the Fifth Amendment of the Constitution. See

*United States* v. *Amedy*, 11 Wheat. 412; *Beaston* v. *The Farmers' Bank of Delaware*, 12 Pet. 134. That word in the Fifth Amendment does not include corporations, as the mischief intended to be reached did not apply to corporations.

The privilege embodied in the Amendment is upheld on grounds which vary to some extent; but the privilege is personal and is based upon the consideration of the law for the individual in his capacity as a witness. *Brown* v. *Walker*, 161 U. S. 596; Best on Evidence, 9th ed. p. 113; 3 Taylor on Evidence, § 1453; 1 Greenleaf on Evidence, 16th ed. § 469*d*, and cases cited in notes; *Commonwealth* v. *Shaw*, 4 Cush. 594; Phillipps on Evidence, 4th Am. ed. p. 935; Starkie on Evidence, 10th Am. ed. 4; Wigmore on Evidence, § 2263; *State* v. *Wentworth*, 65 Maine, 234, 241; *Reynolds* v. *Reynolds*, 15 Cox Cr. Cases, 108, 115; *Bartlett* v. *Lewis*, 12 C. B. (N. S.) 249, 265.

While sporadic cases look in a different direction, there have been many decisions, both in this country and in England, in which the courts have refused to permit the privilege to be asserted by an officer or employé in behalf of a corporation of which he is the representative. *New York Life Ins. Co.* v. *People*, 195 Illinois, 430; *In re Moser*, 101 N. W. Rep. 591; *In re Peasley*, 44 Fed. Rep. 271; *Gibbons* v. *Waterloo Bridge*, 5 Price, 491; *Rex* v. *Purnell*, Wilson, 239.

MR. JUSTICE BROWN, after making the foregoing statement, delivered the opinion of the court.

Two issues are presented by the record in this case, which are so far distinct as to require separate consideration. They depend upon the applicability of different provisions of the Constitution, and, in determining the question of affirmance or reversal, should not be confounded. The first of these involves the immunity of the witness from oral examination; the second, the legality of his action in refusing to produce the documents called for by the *subpœna duces tecum*.

1. The appellant justifies his action in refusing to answer the

questions propounded to him, 1st, upon the ground that there was no specific "charge" pending before the grand jury against any particular person; 2d, that the answers would tend to criminate him.

The first objection requires a definition of the word "charge" as used in this connection, which it is not easy to furnish. An accused person is usually charged with crime by a complaint made before a committing magistrate, which has fully performed its office when the party is committed or held to bail, and it is quite unnecessary to the finding of an indictment by a grand jury; or by an information of the district attorney, which is of no legal value in prosecutions for felony; or by a presentment usually made, as in this case, for an offense committed in the presence of the jury; or by an indictment which, as often as not, is drawn after the grand jury has acted upon the testimony. If another kind of charge be contemplated, when and by whom must it be preferred? Must it be in writing, and if so, in what form? Or may it be oral? The suggestion of the witness that he should be furnished with a copy of such charge, if applicable to him is applicable to other witnesses summoned before the grand jury. Indeed, it is a novelty in criminal procedure with which we are wholly unacquainted, and one which might involve a betrayal of the secrets of the grand jury room.

Under the ancient English system, criminal prosecutions were instituted at the suit of private prosecutors, to which the King lent his name in the interest of the public peace and good order of society. In such cases the usual practice was to prepare the proposed indictment and lay it before the grand jury for their consideration. There was much propriety in this, as the most valuable function of the grand jury was not only to examine into the commission of crimes, but to stand between the prosecutor and the accused, and to determine whether the charge was founded upon credible testimony or was dictated by malice or personal ill will.

We are pointed to no case, however, holding that a grand jury

cannot proceed without the formality of a written charge.    Indeed, the oath administered to the foreman, which has come down to us from the most ancient times, and is found in *Rex* v. *Shaftsbury*, 8 Howell's State Trials, 759, indicates that the grand jury was competent to act solely on its own volition. This oath was that "you shall diligently inquire and true presentments make of all such matters, articles, and things as shall be given to you in charge, *as of all other matters, and things as shall come to your own knowledge* touching this present service," etc.    This oath has remained substantially unchanged to the present day.    There was a difference, too, in the nomenclature of the two cases of accusations by private persons and upon their own knowledge.    In the former case their action was embodied in an indictment formally laid before them for their consideration; in the latter case, in the form of a presentment. Says Blackstone in his Commentaries, Book IV, page 301:

"A presentment, properly speaking, is a notice taken by a grand jury of any offense from their own knowledge or observation, without any bill of indictment laid before them at the suit of the King, as the presentment of a nuisance, a libel, and the like; upon which the officer of the court must afterwards frame an indictment, before the party presented can be put to answer it."

Substantially the same language is used in 1 Chitty Crim. Law, 162.

In *United States* v. *Hill*, 1 Brock. 156, it was indicated by Chief Justice Marshall that a presentment and indictment are to be considered as one act, the second to be considered only as an amendment to the first, and that the usage of this country has been to pass over, unnoticed, presentments on which the attorney does not think it proper to institute proceedings.

In a case arising in Tennessee the grand jury, without the agency of the district attorney, had called witnesses before them, whom they interrogated as to their knowledge concerning the then late Cuban expedition.    Mr. Justice Catron sustained the legality of the proceeding and compelled the wit-

nesses to answer. His opinion is reported in Wharton's Criminal Pleading and Practice, 8th ed. § 337. He says: "The grand jury have the undoubted right to send for witnesses and have them sworn to give evidence generally, and to found presentments on the evidence of such witnesses; and the question here is, whether a witness thus introduced is legally bound to disclose whether a crime has been committed, and also who committed the crime." His charge contains a thorough discussion of the whole subject.

While presentments have largely fallen into disuse in this country, the practice of grand juries acting upon notice, either of their own knowledge or upon information obtained by them, and incorporating their findings in an indictment, still largely obtains. Whatever doubts there may be with regard to the early English procedure, the practice in this country, under the system of public prosecutions carried on by officers of the State appointed for that purpose, has been entirely settled since the adoption of the Constitution. In a lecture delivered by Mr. Justice Wilson of this court, who may be assumed to have known the current practice, before the students of the University of Pennsylvania, he says (Wilson's Works, vol. II, page 213):

"It has been alleged, that grand juries are confined, in their inquiries, to the bills offered to them, to the crimes given them in charge, and to the evidence brought before them by the prosecutor. But these conceptions are much too contracted; they present but a very imperfect and unsatisfactory view of the duty required from grand jurors, and of the trust reposed in them. They are not appointed for the prosecutor or for the court; they are appointed for the government and for the people; and of both the government and people it is surely the concernment that, on one hand, all crimes, whether given or not given in charge, whether described or not described with professional skill, should receive the punishment, which the law denounces; and that, on the other hand, innocence, however strongly assailed by accusations drawn up in regular form, and

by accusers, marshalled in legal array, should, on full investigation, be secure in that protection, which the law engages that she shall enjoy inviolate.

"The oath of a grand juryman—and his oath is the commission under which he acts—assigns no limits, except those marked by diligence itself, to the course of his inquiries: Why, then, should it be circumscribed by more contracted boundaries? Shall diligent inquiry be enjoined? And shall the means and opportunities of inquiry be prohibited or restrained?"

Similar language was used by Judge Addison, President of the Court of Common Pleas, in charging the grand jury at the session of the Common Pleas Court in 1791 (Addison's Pa. Rep. Appx. p. 38):

"If the grand jury, *of their own knowledge*, or the knowledge of any of them, or from the examination of witnesses, know of any offense committed in the county, for which no indictment is preferred to them, it is their duty, either to inform the officer, who prosecutes for the State, of the nature of the offense, and desire that an indictment for it be laid before them; or, if they do not, or if no such indictment be given them, it is their duty to give such information of it to the court; stating, without any particular form, the facts and circumstances which constitute the offense. This is called a presentment."

The practice then prevailing, with regard to the duty of grand juries, shows that a presentment may be based not only upon their own personal knowledge, but from the examination of witnesses.

While no case has arisen in this court in which the question has been distinctly presented, the authorities in the state courts largely preponderate in favor of the theory that the grand jury may act upon information received by them from the examination of witnesses without a formal indictment, or other charge previously laid before them. An analysis of cases approving of this method of procedure would unduly burden this opinion, but the following are the leading ones upon the subject: *Ward* v. *State*, 2 Missouri, 120; *State* v. *Terry*, 30 Missouri, 368; *Ex*

*parte Brown,* 72 Missouri, 83; *Commonwealth* v. *Smyth,* 11 Cushing, 473; *State* v. *Wolcott,* 21 Connecticut, 272, 280; *State* v. *Magrath,* 44 N. J. L. 227; Thompson & Merriam on Juries, §§ 615-617. In *Blaney* v. *Maryland,* 74 Maryland, 153, the court said:

"However restricted the functions of the grand juries may be elsewhere, we hold that in this State they have plenary inquisitorial powers, and may lawfully themselves, and upon their own motion, originate charges against offenders though no preliminary proceedings have been had before a magistrate, and though neither the court not the state's attorney has laid the matter before them."

The rulings of the inferior Federal courts are to the same effect. Mr. Justice Field, in charging a grand jury in California (2 Sawy. 667), said to the grand jury acting upon their own knowledge:

"Not by rumors or reports, but by knowledge acquired from the evidence before you, and from your own observations. Whilst you are inquiring as to one offense, another and a different offense may be proved, or witnesses before you may, in testifying, commit the crime of perjury."

Similar language was used in *United States* v. *Kimball,* 117 Fed. Rep. 156, 161; *United States* v. *Reed,* 2 Blatch. 435, 449; *United States* v. *Terry,* 39 Fed. Rep. 355. And in *Frisbie* v. *United States,* 157 U. S. 160, it is said by Mr. Justice Brewer:

"But in this country it is for the grand jury to investigate any alleged crime, no matter how or by whom suggested to them, and after determining that the evidence is sufficient to justify putting the suspected party on trial, to direct the preparation of the formal charge or indictment."

There are doubtless a few cases in the state courts which take a contrary view, but they are generally such as deal with the abuses of the system, as the indiscriminate summoning of witnesses with no definite object in view and in a spirit of meddlesome inquiry. In the most pertinent of these cases, *In re Lester,* 77 Georgia, 143, the Mayor of Savannah, who was also *ex*

*officio* the presiding judge of a court of record, was called upon to bring into the Superior Court the "Information Docket" of his court, to be used as evidence by the State in certain cases pending before the grand jury. It was held "that the powers of the body are inquisitorial to a certain extent is undeniable; yet they have to be exercised within well defined limits. . . . The grand jury can find no bill nor make any presentment except upon the testimony of witnesses sworn in a particular case, where the party is charged with a specified offense."

This case is readily distinguishable from the one under consideration, in the fact that the subpoena in this case did specify the action as one between the United States and the American Tobacco Company and the MacAndrews-Forbes Company; and that the Georgia Penal Code prescribed a form of oath for the grand jury, "that the evidence you shall give the grand jury on this bill of indictment (or presentment, as the case may be, here state the case), shall be the truth," etc. This seems to confine the witness to a charge already laid before the jury.

In *Lewis* v. *Board of Commissioners*, 74 N. Car. 194, the English practice, which requires a preliminary investigation where the accused can confront the accuser and witnesses with testimony, was adopted as more consonant to principles of justice and personal liberty. It was further said that none but witnesses have any business before the grand jury, and that the solicitor may not be present, even to examine them. The practice in this particular in the Federal courts has been quite the contrary.

Other cases lay down the principle that it must be made to appear to the grand jury that there is reason to believe that a crime has been committed, and that they have not the power to institute or prosecute an inquiry on the chance that some crime may be discovered. *In Matter of Morse,* 18 N. Y. Criminal Rep. 312; *State* v. *Adams,* 70 Tennessee, 647 (an unimportant case, turning upon a local statute). In Pennsylvania grand juries are somewhat more restricted in their powers than is usual in other States, *McCullough* v. *Commonwealth,* 67 Pa. St.

30; *Rowand* v. *Commonwealth,* 82 Pa. St. 405; *Commonwealth*
v. *Green,* 126 Pa. St. 531, and in Tennessee inquisitorial powers
are granted in certain cases and withheld in others. *State* v.
*Adams, supra; State* v. *Smith,* Meigs, 99.

We deem it entirely clear that under the practice in this
country, at least, the examination of witnesses need not be
preceded by a presentment or indictment formally drawn up,
but that the grand jury may proceed, either upon their own
knowledge or upon the examination of witnesss, to inquire for
themselves whether a crime cognizable by the court has been
committed; that the result of their investigations may be sub-
sequently embodied in an indictment, and that in summoning
witnesses it is quite sufficient to apprise them of the names of
the parties with respect to whom they will be called to testify,
without indicating the nature of the charge against them. So
valuable is this inquisitorial power of the grand jury that, in
States where felonies may be prosecuted by information as well
as indictment, the power is ordinarily reserved to courts of im-
panelling grand juries for the investigation of riots, frauds and
nuisances, and other cases where it is impracticable to ascertain
in advance the names of the persons implicated. It is impos-
sible to conceive that in such cases the examination of witnesses
must be stopped until a basis is laid by an indictment formally
preferred, when the very object of the examination is to ascer-
tain who shall be indicted. As criminal prosecutions are in-
stituted by the State through an officer selected for that purpose,
he is vested with a certain discretion with respect to the cases
he will call to their attention, the number and character of the
witnesses, the form in which the indictment shall be drawn,
and other details of the proceedings. Doubtless abuses of this
power may be imagined, as if the object of the inquiry were
merely to pry into the details of domestic or business life. But
were such abuses called to the attention of the court, it would
doubtless be alert to repress them. While the grand jury may
not indict upon current rumors or unverified reports, they may
act upon knowledge acquired either from their own obser-

vations or upon the evidence of witnesses given before them.

2. Appellant also invokes the protection of the Fifth Amendment to the Constitution, which declares that no person "shall be compelled in any criminal case to be a witness against himself," and in reply to various questions put to him he declined to answer, on the ground that he would thereby incriminate himself.

The answer to this is found in a proviso to the General Appropriation Act of February 25, 1903, 32 Stat. 854, 904, that "no person shall be prosecuted or be subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he may testify or produce evidence, documentary or otherwise, in any proceeding, suit, or prosecution under said acts," of which the Anti Trust Law is one, providing, however, that "no person so testifying shall be exempt from prosecution or punishment for perjury committed in so testifying."

While there may be some doubt whether the examination of witnesses before a grand jury is a suit or prosecution, we have no doubt that it is a "proceeding" within the meaning of this proviso. The word should receive as wide a construction as is necessary to protect the witness in his disclosures, whenever such disclosures are made in pursuance of a judicial inquiry, whether such inquiry be instituted by a grand jury, or upon the trial of an indictment found by them. The word "proceeding" is not a technical one, and is aptly used by courts to designate an inquiry before a grand jury. It has received this interpretation in a number of cases. *Yates* v. *The Queen*, 14 Q. B. D. 648; *Hogan* v. *State*, 30 Wisconsin, 428.

The object of the amendment is to establish in express language and upon a firm basis the general principle of English and American jurisprudence, that no one shall be compelled to give testimony which may expose him to prosecution for crime. It is not declared that he may not be compelled to testify to facts which may impair his reputation for probity, or even tend to disgrace him, but the line is drawn at testimony that may ex-

pose him to prosecution. If the testimony relate to criminal acts long since past, and against the prosecution of which the statute of limitations has run, or for which he has already received a pardon or is guaranteed an immunity, the amendment does not apply.

The interdiction of the Fifth Amendment operates only where a witness is asked to incriminate himself—in other words, to give testimony which may possibly expose him to a criminal charge. But if the criminality has already been taken away, the Amendment ceases to apply. The criminality provided against is a present, not a past criminality, which lingers only as a memory and involves no present danger of prosecution. To put an extreme case, a man in his boyhood or youth may have committed acts which the law pronounces criminal, but it would never be asserted that he would thereby be made a criminal for life. It is here that the law steps in and says that if the offense be outlawed or pardoned, or its criminality has been removed by statute, the Amendment ceases to apply. The extent of this immunity was fully considered by this court in *Counselman* v. *Hitchcock*, 142 U. S. 547, in which the immunity offered by Rev. Stat. section 860, was declared to be insufficient. In consequence of this decision an act was passed applicable to testimony before the Interstate Commerce Commission in almost the exact language of the act of February 25, 1903; above quoted. This act was declared by this court in *Brown* v. *Walker*, 161 U. S. 591, to afford absolute immunity against prosecution for the offense to which the question related, and deprived the witness of his constitutional right to refuse to answer. Indeed, the act was passed apparently to meet the declaration in *Counselman* v. *Hitchcock*, p. 586, that "a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offense to which the question relates." If the constitutional Amendment were unaffected by the immunity statute, it would put it within the power of the witness to be his own judge as to what would tend to incriminate him, and would justify him in refusing to answer almost

any question in a criminal case, unless it clearly appeared that the immunity was not set up in good faith.

We need not restate the reasons given in *Brown* v. *Walker*, both in the opinion of the court, and in the dissenting opinion, wherein all the prior authorities were reviewed, and a conclusion reached by a majority of the court, which fully covers the case under consideration.

The suggestion that a person who has testified compulsorily before a grand jury may not be able, if subsequently indicted for some matter concerning which he testified, to procure the evidence necessary to maintain his plea, is more fanciful than real. He would have not only his own oath in support of his immunity, but the notes often, though not always, taken of the testimony before the grand jury, as well as the testimony of the prosecuting officer, and of every member of the jury present. It is scarcely possible that all of them would have forgotten the general nature of his incriminating testimony or that any serious conflict would arise therefrom. In any event, it is a question relating to the weight of the testimony, which could scarcely be considered in determining the effect of the immunity statute. The difficulty of maintaining a case upon the available evidence is a danger which the law does not recognize. In prosecuting a case, or in setting up a defense, the law takes no account of the practical difficulty which either party may have in procuring his testimony. It judges of the law by the facts which each party claims, and not by what he may ultimately establish.

The further suggestion that the statute offers no immunity from prosecution in the state courts was also fully considered in *Brown* v. *Walker* and held to be no answer. The converse of this was also decided in *Jack* v. *Kansas*, 199 U. S. 372, namely, that the fact that an immunity granted to a witness under a state statute would not prevent a prosecution of such witness for a violation of a Federal statute, did not invalidate such statute under the Fourteenth Amendment. It was held both by this court and by the Supreme Court of Kansas that

the possibility that information given by the witness might be used under the Federal act did not operate as a reason for permitting the witness to refuse to answer, and that a danger so unsubstantial and remote did not impair the legal immunity. Indeed, if the argument were a sound one it might be carried still further and held to apply not only to state prosecutions within the same jurisdiction, but to prosecutions under the criminal laws of other States to which the witness might have subjected himself. The question has been fully considered in England, and the conclusion reached by the courts of that country that the only danger to be considered is one arising within the same jurisdiction and under the same sovereignty. *Queen* v. *Boyes*, 1 B. & S. 311; *King of the Two Sicilies* v. *Willcox*, 7 State Trials (N. S.), 1049, 1068; *State* v. *March*, 1 Jones (N. Car.), 526; *State* v. *Thomas*, 98 N. Car. 599.

The case of *United States* v. *Saline Bank*, 1 Pet. 100, is not in conflict with this. That was a bill for discovery, filed by the United States against the cashier of the Saline Bank, in the District Court of the Virginia District, who pleaded that the emission of certain unlawful bills took place, within the State of Virginia, by the law whereof penalties were inflicted for such emissions. It was held that defendants were not bound to answer and subject themselves to those penalties. It is sufficient to say that the prosecution was under a state law which imposed the penalty, and that the Federal court was simply administering the state law, and no question arose as to a prosecution under another jurisdiction.

But it is further insisted that while the immunity statute may protect individual witnesses it would not protect the corporation of which appellant was the agent and representative. This is true, but the answer is that it was not designed to do so. The right of a person under the Fifth Amendment to refuse to incriminate himself is purely a personal privilege of the witness. It was never intended to permit him to plead the fact that some third person might be incriminated by his testimony, even

though he were the agent of such person.   A privilege so extensive might be used to put a stop to the examination of every witness who was called upon to testify before the grand jury with regard to the doings or business of his principal, whether such principal were an individual or a corporation.   The question whether a corporation is a "person" within the meaning of this Amendment really does not arise, except perhaps where a corporation is called upon to answer a bill of discovery, since it can only be heard by oral evidence in the person of some one of its agents or employés.   The Amendment is limited to a person who shall be compelled in any criminal case to be a witness against *himself*, and if he cannot set up the privilege of a third person, he certainly cannot set up the privilege of a corporation.   As the combination or conspiracies provided against by the Sherman Anti Trust Act can ordinarily be proved only by the testimony of parties thereto, in the person of their agents or employés, the privilege claimed would practically nullify the whole act of Congress.   Of what use would it be for the legislature to declare these combinations unlawful if the judicial power may close the door of access to every available source of information upon the subject?   Indeed, so strict is the rule that the privilege is a personal one that it has been held in some cases that counsel will not be allowed to make the objection. We hold that the questions should have been answered.

3. The second branch of the case relates to the non-production by the witness of the books and papers called for by the *subpœna duces · tecum*.   The witness put his refusal on the ground, first, that it was impossible for him to collect them within the time allowed; second, because he was advised by counsel that under the circumstances he was under no obligation to produce them; and, finally, because they might tend to incriminate him.

Had the witness relied solely upon the first ground, doubtless the court would have given him the necessary time.   The last ground we have already held untenable.   While the second ground does not set forth with technical accuracy the real rea-

son for declining to produce them, the witness could not be expected to speak with legal exactness, and we think is entitled to assert that the subpœna was an infringement upon the Fourth Amendment to the Constitution, which declares that "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The construction of this amendment was exhaustively considered in the case of *Boyd* v. *United States,* 116 U. S. 616, which was an information *in rem* against certain cases of plate glass, alleged to have been imported in fraud of the revenue acts. On the trial it became important to show the quantity and value of the glass contained in a number of cases previously imported; and the district judge, under section 5 of the act of June 22, 1874, directed a notice to be given to the claimants, requiring them to produce the invoice of these cases under penalty that the allegations respecting their contents should be taken as confessed. We held (p. 622) "that a compulsory production of a man's private papers to establish a criminal charge against him, or to forfeit his property, is within the scope of the Fourth Amendment to the Constitution, in all cases in which a search and seizure would be," and that the order in question was an unreasonable search and seizure within that Amendment.

The history of this provision of the Constitution and its connection with the former practice of general warrants, or writs of assistance, was given at great length, and the conclusion reached that the compulsory extortion of a man's own testimony, or of his private papers, to connect him with a crime or a forfeiture of his goods, is illegal (p. 634), "is compelling him to be a witness against himself, within the meaning of the Fifth Amendment to the Constitution, and is the equivalent of a search and seizure—and an unreasonable search and seizure—within the Fourth Amendment.

Subsequent cases treat the Fourth and Fifth Amendments as quite distinct, having different histories, and performing separate functions. Thus in the case of *Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447, the constitutionality of the Interstate Commerce Act, so far as it authorized the Circuit Courts to use their processes in aid of inquiries before the Commission, was sustained, the court observing in that connection:

"It was clearly competent for Congress, to that end, to invest the Commission with authority to require the attendance and testimony of witnesses, and the production of books, papers, tariffs, contracts, agreements and documents relating to any matter legally committed to that body for investigation. We do not understand that any of these propositions are disputed in this case."

The case of *Adams* v. *New York,* 192 U. S. 585, which was a writ of error to the Supreme Court of the State of New York, involving the seizure of certain gambling paraphernalia, was treated as involving the construction of the Fourth and Fifth Amendments to the Federal Constitution. It was held, in substance, that the fact that papers pertinent to the issue may have been illegally taken from the possession of the party against whom they are offered, was not a valid objection to their admissibility; that the admission, as evidence in a criminal trial of papers found in the execution of a valid search warrant prior to the indictment, was not an infringement of the Fifth Amendment, and that by the introduction of such evidence defendant was not compelled to incriminate himself. The substance of the opinion is contained in the following paragraph. It was contended that "If a search warrant is issued for stolen property and burglars' tools be discovered and seized, they are to be excluded from testimony by force of these Amendments. We think they were never intended to have that effect, but are rather designed to protect against compulsory testimony from a defendant against himself in a criminal trial, and to punish wrongful invasion of the home of the citizen or the unwarranted seizure of his papers and property, and to

render invalid legislation or judicial procedure having such effect."

The *Boyd* case must also be read in connection with the still later case of *Interstate Commerce Commission* v. *Baird*, 194 U. S. 25, which arose upon the petition of the Commission for orders requiring the testimony of witnesses and the production of certain books, papers and documents. The case grew out of a complaint against certain railway companies that they charged unreasonable and unjust rates for the transportation of anthracite coal. Objection was made to the production of certain contracts between these companies upon the ground that it would compel the witnesses to furnish evidence against themselves in violation of the Fifth Amendment, and would also subject the parties to unreasonable searches and seizures. It was held that the Circuit Court erred in holding the contracts to be irrelevant, and in refusing to order their production as evidence by the witnesses who were parties to the appeal. In delivering the opinion of the court the *Boyd case* was again considered in connection with the Fourth and Fifth Amendments, and the remark made by Mr. Justice Day that the immunity statute of 1893 "protects the witness from such use of the testimony given as will result in his punishment for crime or the forfeiture of his estate."

Having already held that by reason of the immunity act of 1903, the witness could not avail himself of the Fifth Amendment, it follows that he cannot set up that Amendment as against the production of the books and papers, since in respect to these he would also be protected by the immunity act. We think it quite clear that the search and seizure clause of the Fourth Amendment was not intended to interfere with the power of courts to compel, through a *subpœna duces tecum*, the production, upon a trial in court, of documentary evidence. As remarked in *Summers* v. *Moseley*, 2 Cr. & M. 477, it would be "utterly impossible to carry on the administration of justice" without this writ. The following authorities are conclusive upon this question: *Amey* v. *Long*, 9 East, 473; *Bull* v. *Love-*

*land,* 10 Pick. 9; *U. S. Express Co.* v. *Henderson,* 69 Iowa, 40; Greenleaf on Evidence, 469*a*.

If, whenever an officer or employé of a corporation were summoned before a grand jury as a witness he could refuse to produce the books and documents of such corporation, upon the ground that they would incriminate the corporation itself, it would result in the failure of a large number of cases where the illegal combination was determinable only upon the examination of such papers. Conceding that the witness was an officer of the corporation under investigation, and that he was entitled to assert the rights of the corporation with respect to the production of its books and papers, we are of the opinion that there is a clear distinction in this particular between an individual and a corporation, and that the latter has no right to refuse to submit its books and papers for an examination at the suit of the State. The individual may stand upon his constitutional rights as a citizen. He is entitled to carry on his private business in his own way. His power to contract is unlimited. He owes no duty to the State or to his neighbors to divulge his business, or to open his doors to an investigation, so far as it may tend to criminate him. He owes no such duty to the State, since he receives nothing therefrom, beyond the protection of his life and property. His rights are such as existed by the law of the land long antecedent to the organization of the State, and can only be taken from him by due process of law, and in accordance with the Constitution. Among his rights are a refusal to incriminate himself, and the immunity of himself and his property from arrest or seizure except under a warrant of the law. He owes nothing to the public so long as he does not trespass upon their rights.

Upon the other hand, the corporation is a creature of the State. It is presumed to be incorporated for the benefit of the public. It receives certain special privileges and franchises, and holds them subject to the laws of the State and the limitations of its charter. Its powers are limited by law. It can make no contract not authorized by its charter. Its rights to

act as a corporation are only preserved to it so long as it obeys the laws of its creation. There is a reserved right in the legislature to investigate its contracts and find out whether it has exceeded its powers. It would be a strange anomaly to hold that a State, having chartered a corporation·to make use of certain franchises, could not in the exercise of its sovereignty inquire how these franchises had been employed, and whether they had been abused, and demand the production of the corporate books and papers for that purpose. The defense amounts to this: That an officer of a corporation, which is charged with a criminal violation of the statute, may plead the criminality of such corporation as a refusal to produce its books. To state this proposition is to answer it. While an individual may lawfully refuse to answer incriminating questions unless protected by an immunity statute, it does not follow that a corporation, vested with special privileges and franchises, may refuse to show its hand when charged with an abuse of such privileges.

It is true that the corporation in this case was chartered under the laws of New Jersey, and that it receives its franchise from the legislature of that State; but such franchises, so far as they involve questions of interstate commerce, must also be exercised in subordination to the power of Congress to regulate such commerce, and in respect to this the General Government may also assert a sovereign authority to ascertain whether such franchises have been exercised in a lawful manner, with a due regard to its own laws. Being subject to this dual sovereignty, the General Government possesses the same right to see that its own laws are respected as the State would have with respect to the special franchises vested in it by the laws of the State. The powers of the General Government in this particular in the vindication of its own laws, are the same as if the corporation had been created by an act of Congress. It is not intended to intimate, however, that it has a general visitatorial power over state corporations.

4. Although, for the reasons above stated, we are of the

opinion that an officer of a corporation which is charged with a violation of a statute of the State of its creation, or of an act of Congress passed in the exercise of its constitutional powers, cannot refuse to produce the books and papers of such corporation, we do not wish to be understood as holding that a corporation is not entitled to immunity, under the Fourth Amendment, against *unreasonable* searches and seizures. A corporation is, after all, but an association of individuals under an assumed name and with a distinct legal entity. In organizing itself as a collective body it waives no constitutional immunities appropriate to such body. Its property cannot be taken without compensation. It can only be proceeded against by due process of law, and is protected, under the Fourteenth Amendment, against unlawful discrimination. *Gulf &c. Railroad Company* v. *Ellis*, 165 U. S. 150, 154, and cases cited. Corporations are a necessary feature of modern business activity, and their aggregated capital has become the source of nearly all great enterprises.

We are also of opinion that an order for the production of books and papers may constitute an unreasonable search and seizure within the Fourth Amendment. While a search ordinarily implies a quest by an officer of the law, and a seizure contemplates a forcible dispossession of the owner, still, as was held in the *Boyd case*, the substance of the offense is the compulsory production of private papers, whether under a search warrant or a *subpœna duces tecum*, against which the person, be he individual or corporation, is entitled to protection. Applying the test of reasonableness to the present case, we think the *subpœna duces tecum* is far too sweeping in its terms to be regarded as reasonable. It does not require the production of a single contract, or of contracts with a particular corporation, or a limited number of documents, but all understandings, contracts or correspondence between the MacAndrews & Forbes Company, and no less than six different companies, as well as all reports made, and accounts rendered by such companies from the date of the organization of the MacAndrews & Forbes Com-

pany, as well as all letters received by that company since its organization from more than a dozen different companies, situated in seven different States in the Union.

If the writ had required the production of all the books, papers and documents found in the office of the MacAndrews & Forbes Company, it would scarcely be more universal in its operation, or more completely put a stop to the business of that company. Indeed, it is difficult to say how its business could be carried on after it had been denuded of this mass of material, which is not shown to be necessary in the prosecution of this case, and is clearly in violation of the general principle of law with regard to the particularity required in the description of documents necessary to a search warrant or subpœna. Doubtless many, if not all, of these documents may ultimately be required, but some necessity should be shown, either from an examination of the witnesses orally, or from the known transactions of these companies with the other companies implicated, or some evidence of their materiality produced, to justify an order for the production of such a mass of papers. A general subpœna of this description is equally indefensible as a search warrant would be if couched in similar terms. *Ex parte Brown,* 72 Missouri, 83; *Shaftsbury* v. *Arrowsmith,* 4 Ves. 66; *Lee* v. *Angas,* L. R. 2 Eq. 59.

Of course, in view of the power of Congress over interstate commerce to which we have adverted, we do not wish to be understood as holding that an examination of the books of a corporation, if duly authorized by act of Congress, would constitute an unreasonable search and seizure within the Fourth Amendment.

But this objection to the subpœna does not go to the validity of the order remanding the petitioner, which is, therefore,

*Affirmed.*

MR. JUSTICE HARLAN, concurring.

I concur entirely in what is said in the opinion of the court

in reference to the powers and functions of the grand jury and as to the scope of the Fifth Amendment to the Constitution. I concur also in the affirmance of the judgment, but must withhold my assent to some of the views expressed in the opinion. It seems to me that the witness was not entitled to assert, as a reason for not obeying the order of the court, that the *subpœna duces tecum* was an infringement of the Fourth Amendment, which declares that "the right of the *People* to be secure in their *persons*, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the *persons* or things to be seized." It may be, I am inclined to think as a matter of procedure and practice, that the *subpœna duces tecum* was too broad and indefinite. But the action of the court in that regard was, at the utmost, only error, and that error did not affect its jurisdiction to make the order, nor authorize the witness—whose personal rights, let it be observed, were in no wise involved in the pending inquiry—to refuse compliance with the subpœna, upon the ground that it involved an unreasonable search and seizure of the books, papers and records of the corporation whose conduct, so far as it related to the Sherman Anti Trust Act, was the subject of examination. It was not his privilege to stand between the corporation and the Government in the investigation before the grand jury. In my opinion, a corporation—"an artificial being, invisible, intangible and existing only in contemplation of law"—cannot claim the immunity given by the Fourth Amendment; for, it is not a part of the "People," within the meaning of that Amendment. Nor is it embraced by the word "persons" in the Amendment. If a contrary view obtains, the power of the Government by its representatives to look into the books, records and papers of a corporation of its own creation, to ascertain whether that corporation has obeyed or is defying the law, will be greatly curtailed, if not destroyed. If a corporation, when its affairs are under examination by a grand jury

proceeding in its work under the orders of the court, can plead the immunity given by the Fourth Amendment against unreasonable searches and seizures, may it not equally rely upon that Amendment to protect it even against a statute authorizing or directing the examination by the agents of the Government creating it, of its papers, documents and records, unless they specify the particular papers, documents and records to be examined? If the order of the court below is to be deemed invalid as an unreasonable search and seizure of the papers, books and records of the corporation, could it be deemed valid if made under the express authority of an act of Congress? Congress could not, any more than a court, authorize an unreasonable seizure or search in violation of the Fourth Amendment. In my judgment when a grand jury seeking, in the discharge of its public duties, to ascertain whether a corporation has violated the law in any particular, requires the production of the books, papers and records of such corporation, no officer of that corporation can rightfully refuse, when ordered to do so by the court, to produce such books, papers and records in his official custody, upon the ground simply that the order was, as to the corporation, an unreasonable search and seizure within the meaning of the Fourth Amendment.

Mr. Justice McKenna, also concurring.

I concur in the judgment but not in all the propositions declared by the court. I think the subpoena is sufficiently definite. The charge pending was a violation of the Anti Trust Act of 1890. The documents and papers sought were the understandings and agreements of the accused companies. That the documents commanded were many or evidenced transactions occurring through a period of time are not circumstances fatal to the validity of the subpoena. If there was a violation of the Anti Trust Act, that is, combinations in restraint of trade, it would be probably evidenced by formal agreements, but it might also be evidenced or its transactions alluded to in tele-

grams and letters sent during the time the combination operated. Each telegram, each letter, would contribute proof, and therefore material testimony. Why then should they not be produced? What answer is given? It is said the subpœna is tantamount to requiring all the books, papers and documents found in the office of the MacAndrews & Forbes Company, and an embarrassment is conjectured as a result to its business. These, then, I assume, are the detrimental consequences that will be produced by obedience to the subpœna. If such consequences could be granted they are not fatal to the subpœna. But they may be denied. There can be at most but a temporary use of the books, and this can be accommodated to the convenience of parties. It is matter for the court, and we cannot assume that the court will fail of consideration for the interest of parties or subject them to more inconvenience than the demands of justice may require.

I cannot think that the consequences mentioned are important or necessary to the argument. A more serious matter is the application of the Fourth Amendment of the Constitution of the United States.

It is said " a search implies a quest by an officer of the law; a seizure contemplates a forcible dispossession of the owner." Nothing can be more direct and plain; nothing more expressive to distinguish a subpœna from a search warrant. Can a subpœna lose this essential distinction from a search warrant by the generality or speciality of its terms? I think not. The distinction is based upon what is authorized or directed to be done—not upon the form of words by which the authority or command is given. "The quest of an officer" acts upon the things themselves—may be secret, intrusive, accompanied by force. The service of a subpœna is but the delivery of a paper to a party—is open and aboveboard. There is no element of trespass or force in it. It does not disturb the possession of property. It cannot be finally enforced except after challenge, and a judgment of the court upon the challenge. This is a safeguard against abuse the same as it is of other processes of the

law, and it is all that can be allowed without serious embarrass-ment to the administration of justice. Of course, it constrains the will of parties, subjects their property to the uses of proof. But we are surely not prepared to say that such uses are unreasonable or are sacrifices which the law may not de-mand.

However, I may apprehend consequences that the opinion does not intend. It seems to be admitted that many, if not all, of the documents may ultimately be required, but it is said "some necessity should be shown, either from an examination of the witnesses orally, or from the known transactions of these companies with the other companies implicated, or some evi-dence of their materiality produced, to justify an order for their production." This intimates a different objection to the order of the court than the generality of the subpœna, and, if good at all, would be good even though few instead of many docu-ments had been required or described ever so specifically. I am constrained to dissent from it. The materiality of his tes-timony is not open to a witness to determine, and the order of proof is for the court. Besides, if a grand jury may investigate without specific charge, may investigate upon the suggestion of one of its members, must it demonstrate the materiality of every piece of testimony it calls for before it can require the testi-mony? So limit the power of a grand jury and you may make it impotent in cases where it needs power most and in which its function can best be exercised.

But what does the record show? It shows that Hale refused to give the testimony that, this court says, should have pre-ceded the order under review. He refused to answer what the business of the MacAndrew & Forbes Company was or where its office was, or whether there was an agreement with the com-pany and the American Tobacco Company in regard to the products of their respective businesses or whether the company he represented sold its products throughout the United States. The ground of refusal was that there was no legal warrant or authority for his examination, not that the documents or tes-

timony was not material or not shown to be material. Besides, after objection made to the laying of a foundation, complaint cannot be made that no foundation was laid. And it seems to be an afterthought in the proceedings on *habeas corpus* that the ground objection to examination did not exclusively refer to the want of power in the grand jury.

By virtue of its dominion over interstate commerce Congress has power, the opinion of the court asserts, over corporations engaged in that commerce. And the power is the same as if the corporations had been created by Congress. And yet it is said to be a power subject to the limitation of the Fourth Amendment. To this I am not prepared to assent. I have already pointed out the essential distinction between a *subpœna duces tecum* and a search warrant, and, it may be, the case at bar demands from me no expression of opinion of the Fourth Amendment. And I am mindful, too, of the reservation in the opinion of the court of the power of Congress to require by direct legislation the fullest disclosures of their affairs from corporations engaged in interstate commerce. While recognizing this may be true, and, that until such power is exercised, there may be reasons for holding that corporations are entitled to the protection of the Fourth Amendment, there are reasons against the contention, and I wish to guard against any action which would preclude against their consideration in cases where the Fourth Amendment may be a more determining factor than it is in the case at bar. There are certainly strong reasons for the contention that if corporations cannot plead the immunity of the Fifth Amendment, they cannot plead the immunity of the Fourth Amendment. The protection of both Amendments, it can be contended, is against the compulsory production of evidence to be used in criminal trials. Such warrants are used in aid of public prosecutions (Cooley Constitutional Lim. 6th ed. 364), and in *Boyd* v. *United States*, 116 U. S. 616, a relation between the Fourth Amendment and the Fifth Amendment was declared. It was said the Amendments throw great light on each other, "for the 'unreasonable searches and seizures' con-

demned in the Fourth Amendment are almost always made for the purpose of compelling a man to give evidence against himself, which in criminal cases is condemned in the Fifth Amendment; and compelling a man 'in a criminal case to be a witness against himself,' which is condemned in the Fifth Amendment, throws light on the question as to what is an 'unreasonable search and seizure' within the meaning of the Fourth Amendment. And we have been unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself." *Boyd* v. *United States* is still recognized, and if its reasoning remains unimpaired, and the purpose and effect of the Fourth Amendment receives illumination from the Fifth, or, to express the idea differently, if the Amendments are the complements of each other, directed against the different ways by which a man's immunity from giving evidence against himself may be violated, it would seem a strong, if not an inevitable conclusion, that if corporations have not such immunity they can no more claim the protection of the Fourth Amendment than they can of the Fifth.

Mr. Justice Brewer, with whom the Chief Justice concurred, dissenting.

With what is said in the opinion of the court of the necessity of a " charge, " with the proposition that the immunity granted by the Federal statute is sufficient protection against both the Nation and the several States, with the holding that the protection accorded by the Fifth Amendment to the Constitution is personal to the individual and does not extend to an agent of an individual or justify such agent in refusing to give testimony incriminating his principal, and also that the *subpœna duces tecum* cannot be sustained, I fully agree.

Further, I desire to emphasize certain truths which in this and other cases decided to-day seem to be ignored or depreciated. The immunities and protection of articles 4, 5 and 14

of the Amendments to the Federal Constitution are available to a corporation so far as in the nature of things they are applicable. Its property may not be taken for public use without just compensation. It cannot be subjected to unreasonable searches and seizures. It cannot be deprived of life or property without due process of law.

It may be well to compare the words of description in articles 4 and 5 with those in article 14:

"Article 4. The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

"Article 5. No person . . . shall be compelled in any criminal case to be a witness against himself, nor to be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

"Article 14. . . . Nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

In *Santa Clara County* v. *Southern Pacific Railroad,* 118 U. S. 394, 396, Mr. Chief Justice Waite said:

"The court does not wish to hear argument on the question whether the provision in the Fourteenth Amendment to the Constitution, which forbids a State to deny to any person within its jurisdiction the equal protection of the laws, applies to these corporations. We are all of opinion that it does."

See also *Pembina Mining Company* v. *Pennsylvania,* 125 U. S. 181; *Missouri Pacific Railway Company* v. *Mackey,* 127 U. S. 205; *Minneapolis & St. Louis Railway Company* v. *Beckwith,* 129 U. S. 26; *Charlotte &c. Railroad* v. *Gibbes,* 142 U. S. 386; *Monongahela Navigation Company* v. *United States,* 148 U. S. 312; *Gulf, Colorado & Santa Fe Ry.* v. *Ellis,* 165 U. S. 150, 154,

and cases cited; *Chicago, Burlington & Quincy Railroad Company* v. *Chicago,* 166 U. S. 226.

These decisions were under the Fourteenth Amendment, but if the word "person" in that Amendment includes corporations, it also includes corporations when used in the Fourth and Fifth Amendments.

By the Fourth Amendment the "people" are guaranteed protection against unreasonable searches and seizures. "Citizens" is a descriptive word; no broader, to say the least, than "people."

As repeatedly held, a corporation is a citizen of a State for purposes of jurisdiction of Federal courts, and, as a citizen, it may locate mining claims under the laws of the United States, *McKinley* v. *Wheeler,* 130 U. S. 630, and is entitled to the benefit of the Indian Depredation Acts. *United States* v. *Northwestern Express Company,* 164 U. S. 686. Indeed, it is essentially but an association of individuals, to which is given certain rights and privileges, and in which is vested the legal title. The beneficial ownership is in the individuals, the corporation being simply an instrumentality by which the powers granted to these associated individuals may be exercised. As said by Chief Justice Marshall in *Providence Bank* v. *Billings,* 4 Pet. 514, 562: "The great object of an incorporation is to bestow the character and properties of individuality on a collective and changing body of men."

*United States* v. *Amedy,* 11 Wheat. 392, was the case of an indictment under an act of Congress for destroying a vessel with intent to prejudice the underwriters. The act of Congress declared that "if any person shall . . . willfully and corruptly cast away . . . any ship or vessel . . . with intent or design to prejudice any person or persons that hath underwritten, or shall underwrite, any policy," etc. The indictment charged an intent to defraud an incorporated insurance company, and the court held that a corporation is a person within the meaning of the act, saying (p. 412):

"The mischief intended to be reached by the statute is the

same, whether it respects private or corporate persons. That corporations are, in law, for civil purposes, deemed persons, is unquestionable. And the citation from 2 Inst. 736, establishes that they are so deemed within the purview of penal statutes. Lord Coke, there, in commenting on the statute of 31 Eliz. c. 7, respecting the erection of cottages, where the word used is, 'no person shall,' etc., says, 'this extends as well to persons politic and incorporate, as to natural persons whatsoever.' "

Neither does the fact that a corporation is engaged in interstate commerce in any manner abridge the protection and applicable immunities accorded by the Amendments. The corporation of which the petitioner was an officer was chartered by a State, and over it the General Government has no more control than over an individual citizen of that State. Its power to regulate commerce does not carry with it a right to dispense with the Fourth and Fifth Amendments, to unreasonably search or seize the papers of an individual or corporation engaged in such commerce, or deprive him or it of any immunity or protection secured by either Amendment.

It is true that there is a power of supervision and inspection of the inside workings of a corporation, but that belongs to the creator of the corporation. If a State has chartered it, the power is lodged in the State. If the Nation, then in the Nation, and it cannot be exercised by any other authority. It is in the nature of the power of visitation.

In Angell & Ames on Corporations, 9th ed. c. 19, §§ 684, 685, the authors say:

"To render the charters or constitutions, ordinances and by-laws of corporations of perfect obligation, and generally to maintain their peace and good government, these bodies are subject to visitation; or, in other words, to the inspection and control of tribunals recognized by the laws of the land. Civil corporations are visited by the Government itself, through the medium of the courts of justice; but the internal affairs of ecclesiastical and eleemosynary corporations are, in general, inspected and controlled by a private visitor.

"In this country, where there is no individual founder or donor, the legislature are the visitors of all corporations founded by them for public purposes, and may direct judicial proceedings against them for abuse or neglects which at common law would cause a forfeiture of their charters."

The matter is discussed in Blackstone's Commentaries, in .par. 3, chap. 18, Book I, and he says:

"I proceed, therefore, next to inquire how these corporations may be visited. For corporations, being composed of individuals, subject to human frailties, are liable, as well as private persons, to deviate from the end of their institution. And for that reason the law has provided proper persons to visit, inquire into, and correct all irregularities that arise in such corporations, either sole or aggregate, and whether ecclesiastical, civil or eleemosynary."

And in respect to civil corporations he adds, same paragraph and chapter (*782):

"The law having by immemorial usage appointed them to be visited and inspected by the King, their founder, in His Majesty's Court of King's Bench, according to the rules of the common law, they ought not to be visited elsewhere, or by any other authority."

In 2 Kent, *300, the author says: "The visitation of civil corporations is by the Government itself, through the medium of the courts of justice."

In *Amherst Academy* v. *Cowls*, 6 Pick. 427, 433, it was held that:

"Without doubt the legislature are the visitors of all corporations founded by them for public purposes, where there is no individual founder or donor, and may direct judicial process against them for abuses or neglects which by common law would cause a forfeiture of their charters."

The right of visitation is for the purpose of control and to see that the corporation keeps within the limits of its powers. It would be strange if a corporation doing business in a dozen States was subject to the visitation of each of those States, and

compelled to regulate its actions according to the judgments—perhaps the conflicting judgments—of the several legislatures. The fact that a state corporation may engage in business which is within the general regulating power of the National Government does not give to Congress any right of visitation or any power to dispense with the immunities and protection of the Fourth and Fifth Amendments. The National Government has jurisdiction over crimes committed within its special territorial limits. Can it dispense in such cases with these immunities and protections? No more can it do so in respect to the acts and conduct of individuals coming within its regulating power. It has the same control over commerce with foreign nations as over that between the States. *Boyd* v. *United States,* 116 U. S. 616, arose under the Revenue Acts, and the applicability of the Fourth and Fifth Amendments was sustained. In that case is an elaborate opinion by Mr. Justice Bradley, speaking for the court, in which the origin of the Fourth and Fifth Amendments is discussed, their relationship to each other shown, and the necessity of a constant adherence to the underlying thought of protection expressed in them strenuously insisted upon. I quote his words (p. 635):

"It may be that it (the proceeding in question) is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be *obsta principiis.*"

Finally, as the *subpœna duces tecum* was the initiatory step in the proceedings before the grand jury against this petitioner,

as that is the major fact in those proceedings, and as it is agreed that it is not sustainable, it seems to me that the order adjudicating him in contempt should be set aside, and this notwithstanding that subsequently he improperly refused to answer certain questions.

The case is not parallel to that of an indictment in two counts upon which a general judgment is entered, and one of which counts is held good and the other bad, for a writ of *habeas corpus* is not a writ of error, and the order to be entered thereon is for a discharge or a remand to custody. If a discharge is ordered no punishment can be inflicted under the judgment as rendered, and if a new prosecution is instituted containing the good count a plea of former conviction will be a full defense. But in the case at bar an order for a discharge will have no such result. The *habeas corpus* statute, Rev. Stat., § 761, provides that "the court, or justice, or judge shall proceed in a summary way . . . to dispose of the party as law and justice require." Justice requires that he should not be subjected to the costs of this *habeas corpus* proceeding, or be punished for contempt when he was fully justified in disregarding the principal demand made upon him.

The order of the Circuit Court should be reversed and the case remanded with instructions to discharge the petitioner, leaving to the grand jury the right to initiate new proceedings not subject to the objections to this.

I am authorized to say that the CHIEF JUSTICE concurs in these views.