## APPENDIX

## IN THE MATTER OF THE REPORT OF THE GRAND JURY FOR THE APRIL, 1911, TERM.

### July 31, 1911.

1. *Grand Jury—Reports by, proper limits of—Secrecy*: It is improper, and a breach of the oath of secrecy, for a grand jury in a report of its doings, to comment on the failure of a person under its investigation to take the stand and testify in explanation of his alleged misconduct

2. *Same—Same—Comment on matters beyond jurisdiction*: It is, also, not within the just powers of a grand jury of this Federal court to make adverse comments on anybody's qualifications, moral or otherwise, for an office held by him under a distinct department, the department of education of the Hawaiian Territorial government, in no way within the court's jurisdiction,—even though that person be under investigation by the grand jury.

*Grand Jury Report:* Motion to expunge.

*Lorrin Andrews* and *LeBlonde & Smith* for movant.

CLEMONS, J. (Memorandum). The grand jury for the April, 1911, term of this court, in a partial report of their actions filed herein on May 15, 1911, said among other things:

"By means of the public press, and through general discussion, our attention was called to certain matters connected with the Hilo High School. The information was so public and general in its nature that we concluded it merited notice from us, if any law of the United States—as was intimated—had been violated by certain persons. The matter was of further interest, inasmuch as it involved the administration of the schools of the Territory. We therefore determined to make as complete investigation as possible concerning the charge of a violation of the laws of the United States alleged to have taken place, and for this purpose had before us numerous witnesses whose testimony might throw any light on the question.

"We beg leave at this time, to make a report thereon.  In

making this report we have taken into consideration the charge of your Honor, that in performing our duties, we should find no indictments unless reasonably satisfied that a trial jury, on the evidence heard by us, would probably convict. With that charge in view we have returned no indictments. Nevertheless, the matter has been of so great public interest, that we feel constrained to make this report thereon. We are not unmindful of the charge of your Honor to the effect that no mention should be made of cases investigated by us wherein no prior legal charge has been entered unless indictments are returned, and that proceedings before the Grand Jury and actions taken by the Grand Jury, where no indictments are returned, should be kept secret. That the investigation in question has been going on, however, has been well known, and by making a report of the same we feel that we do not, at least in spirit, go contrary to your Honor's instructions relative to secrecy.

"The conduct and actions of . . [a certain teacher] of the Hilo High School [naming him] were investigated by us. When considerable testimony had been received relative thereto, we felt that in fairness to [him] . . he should, if he wished, be given ample opportunity to explain what might, without explanation, appear to us to have been incriminating evidence. He was brought before us, with his attorney, and it was stated to him that his conduct was being investigated; that certain witnesses had testified concerning that conduct; and that if he desired, we would be glad to hear anything he might have to say, which would tend to explain what witnesses had testified to. After consulting with his attorney . . [he] stated that he did not desire to testify or make any statement whatsoever. We were therefore left, as to his conduct, with the uncontradicted statements of several witnesses relative to his actions. While we are loath to say it, and while we do not think the evidence would justify a verdict of guilty of a violation of the United States statutes, yet we are of the opinion, from the evidence elicited by us, that [he] . . has conducted himself in a very questionable and immoral manner, which renders him, in our opinion, unfit to act as a teacher of children.

"The conduct of . . [a certain woman teacher, naming her] was also investigated by us, in connection with the

matter, and we are of the opinion that the testimony given by this witness was in no way shaken or shown in the slightest degree to be untruthful."

Thereupon this gentleman, by his attorneys, moved to expunge from the partial report the above-quoted paragraphs relating to him, on the following grounds:

"1.   That the said portion of the said report violated the charge of the presiding Judge of this Court to the said Grand Jury, whereby the said Grand Jury was directed that no mention should be made of cases investigated wherein no prior legal charge had been entered unless indictment should be returned, and that proceedings before the Grand Jury and action taken by the Grand Jury where no indictments are returned, should be kept secret.

"2.   That the Grand Jury was without authority to comment upon the character or morality of any person investigated by it in cases wherein no indictment was found, and was therefore without authority to comment upon the character or morality of this movant in the said report.

"3.   That the said Grand Jury was without authority to report upon the fitness or unfitness of any Territorial employee to occupy his position or to take any action relative to such employee, except to determine whether or not said employee had violated a Federal statute.

"4.   That the said Grand Jury was without authority to disclose whether or not this movant appeared before that body or submitted himself to an examination thereby, or to disclose what effects, if any, such failures to appear had upon the deliberation and decision of that body.

"5.   That the statement made in the above mentioned passage, that 'while we do not think the evidence would justify a verdict of guilty of a violation of the United States statutes, from the evidence elicited by us, that . . the person in question has conducted himself in a very questionable and immoral manner, which renders him, in our opinion, unfit to act as a teacher of children,' is an ambiguous and unwarranted reflection upon the character of this movant by a body holding its investigation in secret, and whose grounds for such reflection neither this movant nor the public have any means of learning.

"6.   That the said portion of the said report is scandalous, impertinent, unprivileged, and libelous *per se.*"

And he moved also to expunge the last paragraph of the report above quoted relating to the woman under investigation, on the grounds following:

"1.   That the said portion of the said report constitutes a violation of the charge of this Court as to comment and secrecy.

"2.   That it is an unauthorized comment upon the evidence of a witness who gave testimony before said Grand Jury against this movant.

"3.   That it is unfair and prejudicial to this movant as comment upon the statements of a witness, whose evidence neither this movant nor the public have any means of knowing."

Inasmuch as the motion was heard *ex parte,* the district attorney not deeming his office called upon to make any appearance, and with no opportunity for the grand jury to defend or even state its position, it seemed fair to call the grand jurors in, as the court did, on their return from the intervening adjournment and, before ruling on the motion, discuss with them the whole matter, instruct them as to the law of the case, meet their objections, if any, and leave the matter in their hands with the expectation that they would take such action as accorded with the court's instructions. To them, therefore, the court stated the fact of the filing of this motion and the grounds thereof, and read the following from Edwards on the Grand Jury, 157-160, as applying to the questions raised by the motion:

[1] "When the grand jurors have completed all the duties which will devolve upon them, it is now customary for them to prepare a written report of their work, which is signed by their foreman and handed to the court crier with the indictments. In this report they frequently take occasion to discuss various matters affecting the public welfare, criticise public officials, act as censors of the morals of the com-

munity, and make recommendations which it is impracticable and impossible to carry into effect. That they are acting outside of their duties as grand jurors in making such presentments will hardly be doubted. As the official accuser for the government, their duty is to present persons not things. That this practice should be continued upon the ground that it calls to the public eye abuses in the administration of government or the existence of vice in the community, is a proposition which rests upon no logical basis. If they have any evidence of the things which they thus set forth, it is their duty to the public and to themselves under their oath, to present the individuals guilty of such offenses. See Judge Stowe's *Charge to Grand Jury*, 3 Pitts. Rep. (Pa.) 179. If they have no personal knowledge of the facts, they are then proceeding in a manner contrary to law. *Case of Lloyd and Carpenter*, 3 Clark (Pa.) 188. If they know the things which they present, they should present individuals; if they do not know, they are committing a wrong in making broad accusations, which, while they cannot be sustained, grievously injure those to whom they indirectly apply.

"This practice received severe condemnation over seventy years ago at the hands of Honorable Daniel Davis then Attorney-General for the State of Massachusetts, who says: 'The practice, not uncommon in some parts of the United States, of bringing forward, in the form of presentments, what are denominated public grievances, relative to the political or moral state of the country, is altogether extra-official, and may be and has been adopted and pursued for purposes foreign to, and inconsistent with, the nature of the institution; and perhaps it is not too much to assert, that the opportunity has been used and perverted to party purposes, and with an intent to produce an effect upon public measures and the public mind. Whenever this shall be the case it is to be considered in the same light as any other usurpation or abuse of the judicial authority. It may, with the same propriety, be exercised by any other branch of the judicial power, by the court, or the traverse jury, as well as the grand jury.' Precedents of Indictments, 11.

"In the case of *Rector v. Smith*, 11 Iowa 302, the grand jury made a written report to the court wherein libellous

statements were made relating to the conduct of a person then in public office. An action for libel was begun against the clerk of the grand jury who had brought the report into court and there read it. An answer was filed by the defendant, who claimed the report was a privileged communication, to which answer the plaintiff demurred but the demurrer was overruled by the lower court. On appeal, the Supreme Court affirmed the judgment and expressly ruled that the report was not a privileged communication. In delivering the opinion of the court, Baldwin J., says:

" 'The grand jury have no power, nor is it their privilege or duty to present any person for a criminal offense except by indictment. If the misconduct of an officer does not amount to a crime, and is not of such magnitude as will justify the jury in finding an indictment, their powers over the offense complained of, are at an end . . . A report by a grand jury presents nothing upon which the court can act, unless it is in reference to the condition of the prison. The court can take no jurisdiction over the complaint charged by such report. Nor can a person thus presented have an opportunity to show himself innocent of the matters complained of. With this view of the question we conclude that the report presented by the defendant as a juror, was not a privileged communication and that he cannot plead this in bar of plaintiff's right to recover.'

"When the grand jury in their presentment thus go beyond their lawful authority, whether they refer to persons by name, title, or innuendo, or to any particular matter or thing, it becomes a serious question whether or not their presentment should be permitted to stand. Clearly in such instance they have exceeded their authority, and in such event their presentment rests upon no legal foundation. There would consequently seem to be no valid reason why a motion to quash or dismiss the presentment, or strike it, or the objectionable part thereof, from the files should not be made. If the grand jurors have exceeded their authority in making such presentment, it is clearly invalid and illegal and may be subjected to attack either by the attorney for the state or by the person or persons to whom the presentment may relate, in the same manner as any presentment or indictment may be attacked. This course has been pursued

in George (*Presentment of Grand Jury*, 1 R. M., Charlt. 149) where the grand jury made a presentment reflecting upon the judges of the Superior Court. The attorney-general moved to expunge the presentment from the minutes which was accordingly done."

Quotations were also then read from *Rector v. Smith*, 11 Iowa, 302, 307, and *In re Jones*, 92 N. Y. Supp. 275, 278, 279, dissent (An appeal in this case was dismissed as unauthorized, 74 N. E. 226). See *In re Gardiner*, 64 N. Y. Supp. 760, 762, holding a report may be improper but still beyond the court's control, a proposition with which this court does not agree. See Edwards, Grand Jury, 163-165, and notes; *State v. Cowan*, 38 Tenn. (1 Head) 280, 281. A valuable opinion of Justice Goff, which came to hand later, follows the dissent in the *Jones* case, supra: *In re Osborne*, 125 N. Y. Supp. 313, 315-319; though it is recognized as arguable that the New York cases might, though they do not seem to, have been influenced by statute. Id. 318-319; *In re Heffernan*, Id. 737, 738.

It was clear that under these authorities the court regarded the motion as well taken, and the jury was dismissed with the assurance that there would be no ruling on the motion until they had had an opportunity to consider the court's suggestion. It soon became apparent that the jury, if not reluctant to act in the matter, were at least uncertain as to how they should or could act. They felt, as several of the jurymen said, that the report was nothing more than what the public was expecting, almost demanding from them, that they had acted in good faith, and most of all that the report was true, and the facts the common knowledge of the community,—that, while the court was right as to the law, they were right as to the facts and that to amend the report by striking that part to which exception had been taken would be to take back what they had said and admit their error of fact. How could they so stultify themselves?

The question of one juror, even, asked in open court at the time of the court's informal charge or discussion, was whether such a retraction would not place the members of the jury in a position of liability to the person whose acts had been under investigation,—in reply to which, it may be said, he was referred to the Iowa decision, supra, at page 308.

The court quite appreciated the jury's position; and the difficulty presented by their attitude then appeared insurmountable. But it seemed best not to be in haste to take the next logical step of expunging the objectionable matter from the report, or the extreme measure of giving the grand jury a dishonorable discharge; and they were excused until the following morning, without final action on the motion. The court then met the jury again, feeling that possibly they had not understood, or fully appreciated the law as before given, according to which their action was, as had been intimated, without authority and a breach of their duty, and the strongest case supposable was put to them, in an endeavor to make clear by a simple illustration the error of their action, and, also, by way of meeting the objections, to show them that even any demand of the public for a report, or even any good that the report may have done, was quite immaterial, except, perhaps, as bearing on their fair, if not well advised, motives and to assure them that the court was not asking them to say "Our report is untrue,—we take it back because it is untrue," but was instructing them that it was right and proper to take it back because it was unauthorized,—because it was no part of their duty, but an abuse of their powers, to make such a report.

It may be said that the court also in the instructions of the day previous had, in passing, told the jury that their report might be taken as a breach of their obligation of secrecy. They had, it is true, as introductory to their re-

port on this matter, stated that the facts were of such notoriety as to make any reference to them no abuse of confidence, but it must be repeated, as was merely suggested to the grand jury, that they should be on their guard against the slightest disclosure of what has taken place before them as a body, and that the only safe course is to preserve absolute secrecy, irrespective of whether the matter is one of notoriety, or not. In one regard, however, the jury did violate their oath of secrecy; the fact of the movant's having refused to take the stand was not notorious and in any event should not have been divulged. It was his constitutional right not to testify and, most certainly his assertion of such constitutional right should not be made the basis of unfavorable comment or inference by a body which is an impartial instrument in the working out of justice under the Constitution. It is no more becoming for a grand jury, than for a petit jury, or counsel in arguing to a jury, or a judge in instructing a jury, to so comment on a defendant's assertion of his constitutional rights.

[2]   The extreme suppositious case which was put to the grand jury at this second meeting, in order to make clear their breach of duty, was, in substance, this:

"Suppose you were a trial jury and, in trying the person now concerned for the same alleged offense as was under investigation here, returned a verdict as follows: 'We, the jury find the defendant not guilty. However, for the good of the public school service (the alleged offender being a school teacher), and also because the people are demanding it, we here state our opinion that there was evidence against the accused which showed him to be an improper person to have charge of school children. He had an opportunity to answer the complaints against him, but he availed hmself of his constitutional right to refuse to testify.' We may suppose that the effect of this extraordinary verdict was good, that it stirred some tardy executives to do their duty (This is only an illustration, not an implication of dereliction of any executive), that there was a clamor for some-

body to take some action and that as you were sitting at the time, the appeal was directed particularly to you; even granted your perfect good faith and a worthy end, still, what only could the court do? The matter would call clearly for the removal somehow of this irrelevant, unauthorized statement from the record. . . As the opinion cited yesterday, of the New York judge, well said, we test a law not by what has been done under it but by what may be done under it. *In re Jones*, 92 N. Y. Supp. 278. It is dangerous for public bodies or officers to go outside of their powers, even to do good. Who is to be the judge? This is not a question of worthy motives or good faith, or of the good your report actually did, or of any public demand to which the report may have been a response. It is a question of law and of rights under it. We must regard the constitutional rights of every person under investigation or accused of crime,—accused rightfully, it may be, but entitled to the benefit of the constitutional guaranty of a trial by a properly constituted body, and of the constitutional guaranty that he shall not be compelled to testify against himself, or at the behest of his accusers, or even to take the stand at all against his free, voluntary consent."

The grand jury, immediately upon their then ensuing session, withdrew the report in question and presented a substitute report as follows (omitting the introductory paragraph, which is the same as that of the original report):

"While the investigation disclosed to our satisfaction that affairs in the Hilo High School were not in a satisfactory condition, yet there was not evidence before us sufficient to return any indictments against any persons whose actions were investigated by us."

In addition to what was said to the grand jury in the court's special charges set forth above, it may be pointed out that the matter on which the body reported, to-wit, the fitness or unfitness of this school teacher as an educator of children, was one over which the court had no jurisdiction, but a matter wholly within the cognizance of the Hawaiian Territorial government. Suppose the grand jury were investigating the Mayor of Honolulu on an unfounded charge of opium smuggling, but incidentally discovered

him to be without the essential mental or moral qualifications for the office, would they not be exhibiting officiousness, and going out of bounds, to report that, though the particular charge be not sustained, they take occasion to say the accused is not a fit person to be Mayor?" Where would the precedent of such criticism, though prefaced as was the report in this case by a gentle apology for its publication, lead the grand jury,—a body of great powers but still of powers exercisable within narrow limits? See *Hale v. Henkel,* 201 U. S. 43, 64, quoted post.

The particular case, because of its alleged flagrancy, may seem to be one which we should be slow to say did not call for a report, but the principle controlling it is clear enough, against such exercise of power. That the foregoing examples of possible abuse are not extreme may be seen in the history of the grand jury in New York county. "Mayor Gaynor, a high legal authority, is one of those who hold it is not any part of the business of a grand jury, . . . . [though] instructed to do so by a judge on the bench, to bring in [even] presentments, so-called, criticising or dealing with the conduct of the city government, or indeed, relative to any other subjects than indictments founded on ascertained violations of the law." Brooklyn Standard-Union, 1911. See at length *In re Osborne, supra* and *In re Heffernan,* supra.

"That the powers of the body are inquisitorial to a certain extent is undeniable; yet they have to be exercised within well defined limits." *Hale v. Henkel,* 201 U. S. 43, 64, quoting *In re Lester,* 77 Ga. 143.

In view of the action of the grand jury in following the law as laid down by the court, no necessity remains for any order on the motion to expunge. The court appreciates this attitude of the grand jurors, and would have regretted exceedingly any possible necessity of discharging with dishonor a body which rendered such valuable services as this

particular jury. Its report, so far as it relates to the matter of conditions on the immigrant ship "Orteric" in alleged violation of the Passenger Act, 22 Stat. 186 [see the case of *United States v. Findley,* ante, p. 166] was distinctly within its domain, and, in contrast with its observations in the matter of the Hilo High School, stands as an example of the exercise of its just powers.

---

For a similar view, not officially reported, of the United States District Court for the Northern District of California, Van Fleet, J., see San Francisco Chronicle, August 9, 1913; see also opinion of Heen, J., First Circuit Court, Territory of Hawaii, reported in Honolulu Star-Bulletin, January 3, 1918, Pacific Commercial Advertiser, January 4, 1918.