STATE, PLAINTIFF-APPELLEE, v. PINCH, DEFENDANT-APPELLANT.

Ohio Appeals, Seventh District, Ashtabula County.

No. 572. Decided December 21, 1962.

(WILLIAM B. BROWN, J., of the Fourth Appellate District, sitting by assignment in the Seventh Appellate District.)

*Mr. Robert E. Webb,* prosecuting attorney, and *Mr. Claude Nicholson,* assistant prosecuting attorney, for plaintiff-appellee. *Mr. James C. Warren,* for defendant-appellant.

138

Wм. B. Brown, J.   This is an appeal on questions of law from the judgment of the Common Pleas Court of Ashtabula County, entered following a verdict of guilty with mercy recommended.

Appellant was indicted on April 16, 1962, tried on May 14 to 17, 1962, and found guilty by the jury on May 17, 1962, under an indictment which charged "The defendant, Robert E. Pinch, did, on or about December 6, 1961, maliciously and forcibly break and enter the inhabited dwelling of Andrew J. Sirilo in the night season with intent to commit larceny therein." Following the plea of not guilty, trial was had. This indictment was originally brought jointly against appellant and one Curtis Estep, but the latter was granted a motion for separate trial on May 14, 1962, for good cause shown.

From the evidence it appeared that on the evening of December 5, 1961, Curtis Estep and Joann Sturgill went to the home of one David Johnson where they borrowed his 1951 Chrysler automobile. Thereafter, Estep and Joann Sturgill met appellant in Ashtabula, Ohio, at the Melody Bar. Thereafter they went to several other bars where appellant and Estep did some drinking. At about 3:30 A. M. on December 6, 1961, these two went to the Grand River Manor Bar located on Mechanicsville Road in Ashtabula County. The bar was closed but the operator stated the appellant asked directions to Windsor and mentioned the name of Dr. Sirilo. Thereafter appellant and a man with a scar on his eye went to the home of John Winnen on the same road and appellant asked directions to Windsor and if Mr. Winnen knew Dr. Sirilo, and if he could purchase some gas. A Deputy Sheriff later described Estep as having a scar over his left eye.

There was testimony that appellant, Estep and Joann Sturgill proceeded in the car to the residence of Dr. Sirilo at Windsor, in Ashtabula County. They parked the car in the driveway adjacent to Dr. Sirilo's residence. Appellant and Estep then broke a lock on a gas tank adjacent to Sirilo's garage and took some gas. Appellant and Estep then went to the bathroom window of Sirilo's home, raised it and entered the home. They then returned and entered a second time. This time they took a kit containing medicants from the bathroom.

At about 4:15 A. M. Dr. Sirilo was awakened by noises. Later "close to five o'clock," Dr. Sirilo was awakened by voices, one of which he identified as appellant's. Other testimony disclosed he knew appellant at a time when they were in the Ashtabula County Jail together. Dr. Sirilo, on his second awakening, turned on lights. The appellant and Estep left the home, returned to the car and drove from the driveway.

Appellant did not testify; Estep's testimony was limited because of his reliance on his privilege against self incrimination, and other than the sketchy remembrances of Dr. Sirilo, most all pertinent testimony was that of Joann Sturgill.

Five assignments of error are asserted by appellant. They are:—

1. The trial court erred in sustaining claims of privilege made by counsel for a witness and thereby excluding competent evidence on behalf of defendant.

2. The trial court erred in overruling the motion of defendant for a directed verdict made at the close of the State's and at the close of all the evidence.

3. Misconduct on the part of the prosecuting attorney in final argument, in uttering remarks over the objection of defendant which were prejudicial to the defendant, and prevented him from having a fair trial.

4. The trial court erred in overruling defendant's motion for new trial.

5. The verdict of the jury and the judgment of the court are contrary to law and against the manifest weight of the evidence.

The first assignment of error is that the trial court erred in sustaining claims of privilege by counsel for a witness and

thereby excluded competent evidence on behalf of the defendant.

Appellant called as his witness Carl Estep. Estep had been jointly indicted with appellant for the offense under trial, but had been granted a separate trial and was awaiting the same.

The court appointed attorney for Estep was in the courtroom and asserted Estep's privilege against self incrimination and immunity to testify concerning matters which might tend to incriminate him.

The witness was sworn, and the court permitted Estep to answer some of the questions and sustained Estep's attorney's objections to others. The court instructed the witness as to his rights under the privilege against self incrimination, noting the fact of the youth of the witness. He permitted Estep time to confer with counsel and the latter eventually said he wished to assert his privilege against self incrimination.

The trial court said:—

"I think it is a basic constitutional right of a person who is under indictment and who is called upon to make utterances and give testimony which may tend to incriminate him. I do not think the law intended to permit the individual to be exposed to such interrogation without advice of counsel as a man certainly cannot be expected to know the full consequences of his answer without advice of counsel. Therefore, I deem it appropriate that his counsel, during the interrogation, be permitted to remain in the courtroom and if there is desire to assert the privilege, that can be asserted and the court will pass on the matter as each question is asked as to whether the question is incriminating or not."

Attorney for Estep thereafter objected to a number of questions put to Estep and the trial court sustained these objections.

Appellant asserts that the intervention of the attorney for Estep in these proceedings deprived this appellant of a fair trial, and moreover that the sustaining of the claim of privilege made by the attorney for the witness was erroneous and excluded competent evidence on behalf of appellant, which was prejudicial to him and prevented him from having a fair trial.

Appellant fails to demonstrate how this unusual procedure caused prejudicial error to him. There was no proffer of what

answers appellant expected to receive. Any testimony this witness could give concerning the alleged crime could also have been introduced through appellant's own testimony. He asserted his privilege against self incrimination, did not take the stand, and now complains because his co-defendant asserted his constitutional rights.

It is agreed that the privilege is a personal one to be asserted by the witness. It certainly was not a privilege of the appellant.

"So, too, the refusal of a witness for an accused to answer a self-incriminatory question is not a circumstance which may be considered as tending to prove the defendant's guilt." 58 American Jurisprudence, 55.

The procedure followed in the trial court was unusual because of the intervention of the attorney for the witness. We see nothing shocking about his approaching the bench and calling the situation to the court's attention. This has been done in other cases. See *State* v. *Shockley*, 80 Pacific, 865; *Brody* v. *U. S.*, 243 F. (2d), 378; *State* v. *Gambino*, 61 So. (2d), 732; *Anderson* v. *State*, 126 Pacific, 840. In the latter case beginning on page 849 there is an excellent discussion of the privilege and the trial court's discretion concerning the same.

The constitutional guaranty against self-incrimination is applicable not only to the accused, but to all witnesses, and protects witnesses, as well as parties, in all manner of proceedings. Thus, a witness cannot be compelled to testify that he, and not the defendant, was guilty of the offense charged. A witness indicted as an accessory cannot be compelled to give self incriminating evidence in the trial of the principal, and one of two jointly indicted defendants cannot compel the other to testify and give self incriminating evidence, regardless of whether they were granted separate trials or not. 3 Wharton's Criminal Evidence, 1966.

As to the extent of the privilege against self incrimination, 8 Wigmore, page 369, says:—

"The privilege applies to any fact which is relevant to a proceeding whose sole or essential object is to charge the claimant with a specific crime. The accused in a criminal case, therefore, is exempt from all answers whatever, for, at least on the prosecution's assumption, they are incriminating."

On page 406 he states:—

"2. Accused. For the party defendant in a criminal case, the privilege has been construed to permit him to refuse to answer any question whatever in the cause.

"(a) This being so, the prosecution could nevertheless on principle have a right at least to call him to be sworn because, as with an ordinary witness, it could not be known beforehand whether he would exercise his privilege. But no court has sanctioned this application of the principle. The contrary is universally held."

On page 410 he states:—

"3. Codefendant. For a codefendant in a criminal case, the privilege of course applies—i. e., one defendant cannot call a codefendant unless the latter waives his privilege. (*United States* v. *Housing Foundation of America*, 176 F. (2d), 665; *State* v. *Medley*, 178 N. C., 710.)"

Granting that this witness's privilege was like that of the accused, was the objection by the attorney for Estep to questions asked of the witness Estep prejudicial? The witness had made known to the court his claim of privilege at least after he understood the same. The rulings thereon were made by the court within its discretion. The act of interposing the objections to certain questions by the attorney was the act of an agent.

As was said in *Brody* v. *United States*, 243 Federal (2d), in Note 5 on page 387:—

"There appears to be some confusion concerning the power of a duly authorized attorney to claim the privilege against self-incrimination on behalf of his client in view of statements in two cases in other circuits that, because the privilege is a personal one, it cannot be asserted by a third party, not even by an attorney. See *Ziegler* v. *United States*, 9 Cir., 1949, 174 F. (2d), 439, 447; *United States* v. *Johnson*, D. C. Pa., 1947, 76 F. Supp., 538, 540. But the authorities cited in these two cases are clearly distinguishable. They either held or said merely that, when a witness is asked to respond to a lawful question, he cannot refuse to answer by setting up 'the privilege of another person or of a corporation as an excuse for a refusal to answer; in other words, the privilege is that of the

witness himself, and not that of the party on trial.' *McAlister* v. *Henkel*, 1906, 201 U. S., 90, 91, 26 S. Ct., 385, 50 L. Ed., 781. See also *Hale* v. *Henkel*, 1906, 201 U. S., 43, 26 S. Ct., 370, 50 L. Ed., 652; *London* v. *Everett H. Dunbar Corp.*, 1 Cir., 1910, 179 F., 506; *In res Knickerbocker Steamboat Co.*, D. C. S. D. N. Y., 1905, 136 F., 956. This is quite different from a holding that a properly authorized agent of an individual, including his attorney, is powerless to assert the privilege for his principal in appropriate circumstances. The Supreme Court has never so held, nor have we.''

Under these special circumstances where the witness is a co-indictee and from the record youthful and uncomprehending of the nature of his privilege, we cannot say that this permission granted by the court to permit the attorney for the witness to interpose objection to questions was an abuse of discretion on the part of the trial court.

This assignment is overruled.

The second assignment of error is that the trial court erred in overruling the motion of defendant for a directed verdict made at the close of the state's case and at the close of the defendant's evidence.

This relates to the quantum of proof introduced by the state as to whether or not the state established beyond a reasonable doubt as to whether the breaking and entering of Dr. Sirilo's property took place in the night time.

Dr. Sirilo testified he was awakened by noises on December 6, 1961, at about 4:15 A. M. (R. 15); that ''close to five o'clock'' (R. 20) he was awakened by voices. His testimony was: ''The conversation, the first words I heard was someone says, 'Help me in,' and the other one says, 'Come on, it's just like money in your pocket.' '' In relation to the departing car leaving the scene, he testified on page 25:—

''Q. Did you notice the color?

''A. I wasn't sure. It was dark and there was no lights but I couldn't say whether it was black, brown or blue.''

On Page 58 he testified on cross-examination:—

''Q. When did you know they were gone?

''A. When I turned the light on and seen the car going down the road.

"Q. What's that?

"A. When I switched my street light on and seen the car going down the road."

Deputy Sheriff White testified he received a call at 5:19 A. M. directing him to Dr. Sirilo's home and arrived at 5:41. He was asked as follows (R. 110):—

"Q. Do you remember the light conditions at that time outside?

"A. Yes, I do.

"Q. What were they?

"A. Dark.

"Q. Beg pardon?

"A. It was dark outside."

The other witness who testified concerning this element was Joann Sturgill. On page 162:—

"Q. Did you go to Dr. Sirilo's?

"A. We all went there, all three of us.

"Q. Do you know what time it was when you went there?

"A. It was between three and five in the morning, somewhere along in there.

"Q. Was it dark?

"A. Yes, but it was getting daylight."

On page 163:—

"Q. Where were you, exactly, in relation to the garage?

"A. I was in the car about half way in the garage.

"Q. And could you see the window they went into?

"A. I could see through the back side window."

On page 186:—

"Q. Joann, could you see across the yard from the car where you were sitting to the window at the back of the house?

"A. Yes, I could.

"Q. Were you watching what was going on?

"A. Yes, I was.

"* * *

"Q. You say you could see across that distance and you were watching?

"A. I didn't say I didn't see. I said I don't remember.

"Q. Could you see the features on the face of Curtis Estep when he was at the window at the back of Dr. Sirilo's house?

"A. Could I see his face?

"Q. Yes, could you see his features?

"A. Put it this way. If I happened to know him, was used to seeing him, or I might not have recognized him.

"Q. But because you knew him you could tell it was him at the window?

"A. Yes, because I know him pretty well and seen him practically every day during all those months.

"Q. It was because it was getting daylight?

"A. Yes.

"Q. And that's why you could see him?

"A. Because the sky was getting light. It was getting daylight enough so I could tell."

On page 183 there is the following testimony:—

"Q. You say it was getting daylight when you got to Dr. Sirilo's?

"A. Well, it was kind of getting daylight.

"Q. Well, was the sky light or not? Was the sky beginning to become brightened by the morning sun or not?

"A. There was no sun, no.

"Q. I didn't ask you that.

"Well, put it this way. The sky was light enough if anybody tried to see us they could have recognized us.

"Q. It was light enough to see faces across that yard?

"A. I think so.

"Q. Would it be light enough to see the car from that house?

"A. Definitely."

Later, on cross-examination, asked whether or not she could see Curtis Estep and the defendant across the yard at the back of Dr. Sirilo's house because it was getting daylight, she answered:—

"A. Yes.

"Q. And that's why you could see him?

"A. Because the sky was getting light. It was getting daylight enough so I could tell." (R. 187.)

Other cross-examination of the eyewitness, Joann Sturgill touched on the light conditions:—

"A. I don't think there was any street lights on but the light that was on the sign, if it was one, wouldn't have been

real bright. It would have been a real tiny one like that maybe.

"Q. Nothing light enough to illuminate the highway?

"A. You wouldn't need a light. You could see the highway.

"Q. Daylight?

"A. No, but light enough to see. He backed out without any lights on. If it hadn't been daylight, we would have wrecked." (R. 203.)

"Night season" under our statute is meant that period of time between the termination of daylight in the evening to the earliest dawn of the following morning; that period of time from the setting of the sun to the rising of the sun in the morning when the face of man is no longer discernible. *State* v. *Stuttler,* 172 Ohio St., 311, 312. The syllabus of *State* v. *Stuttler, supra,* states:—"In determining the time of an alleged breaking and entering in the night season, a jury may apply the common experience of mankind to the facts developed and the circumstances surrounding the alleged commission of the offense." This they apparently did.

It is not prejudicial error to overrule a motion for directed verdict, even though properly and timely made, where there is sufficient evidence in the record to justify the trial court in permitting the case to go to the jury. 4 Ohio Jurisprudence (2d), 415.

Whether the offense was committed in the night is to be inferred from facts, and no presumption of law will suffice for this purpose. The question of time is for the jury. 2 Wharton's Criminal Law, 1306.

On review, we believe there is sufficient evidence in this record to justify submission of this question to the jury. Thus, we find the evidence to be conflicting thereon and the issue properly submitted to the jury.

Once in their hands, it is their province to determine the weight and credibility to be given to the witnesses and the weight and value to be given to their testimony.

This assignment is overruled.

As his third assignment of error, appellant asserts misconduct on the part of the prosecuting attorney in final argu-

ment, in uttering remarks over the objection of defendant which were prejudicial to the defendant and prevented him from having a fair trial.

Near the end of his opening argument to the jury, the prosecutor stated:—

"Ladies and gentlemen, the State is going to ask you to come in with a verdict without a recommendation for mercy. We are doing this not from vindictiveness, not from hatred of anyone or anything else. We don't have this feeling in this case or any other, I hope, but our feeling in this case is that we have a duty to the people of our county, that when you go to bed at night, close the door to your house and lock it—many of us don't even lock it—we want to feel safe in that house, If we have got people in our county who will go in, and, seeing a man lying in bed but convinced because a man saw a wallet lying there, will go back in, we can't feel safe, ladies and gentlemen, if this is allowed to go on.

"Mr. Warren: Your Honor, I think this is improper argument in the cases in Ohio. My understanding is that the jury is supposed to try this case on the facts and evidence. The jury should be instructed to disregard this when they consider this man's fate.

(Conference at the Bench.)

"Mr. Nicholson: Ladies and gentlemen, the State of Ohio has provided for this crime to be so punished. That is our indictment; that is what we ask you to do. Our reasons are as we have given them. Thank you."

No instructions were given by the court in regard to this matter at this time. In his charge to the jury, the trial court charged in this regard as follows:—

"Now, ladies and gentlemen of the jury, if, after a careful and impartial consideration of all the evidence in this case, you find that the defendant has been established guilty of burglary, then you will have one further duty to perform, and that is you will determine whether or not you will extend or withhold mercy. It is entirely within your province and your discretion to say whether there is any circumstance or fact in the case, or whether from all the evidence you believe, notwithstanding his guilt, mercy or clemency should be extended. If you do recommend mercy, the court is bound to reduce the punishment

to a penalty of five to thirty years in the penitentiary. If, however, you do not extend mercy, it is incumbent upon the court to impose upon the defendant a term in the penitentiary for life. In that connection, whether you recommend or withhold mercy is a matter solely within your discretion calling for the exercise of your very best and profound judgment, not motivated by consideration or sympathy or as a means of escaping a hard or disagreeable duty, but must be considered by you in the light of all circumstances in the case with respect to evidence submitted to you and other circumstances surrounding this defendant.''

To our mind this instruction had the effect of counteracting any emotion aroused by the statement of the prosecutor. As the appellee points out in his brief, the verdict itself with its recommendation of mercy negates any emotional effect this statement could have had on the substantial rights of the appellant sufficient to warrant a new trial. This assignment is overruled.

The fourth assignment of error is that the court erred in overruling the motion for new trial.

Under it he asserts the question of privilege discussed under the first assignment of error, the matter of the prosecutor's remarks under the third assignment of error, the matter of the night season is discussed in the second and fifth assignment of error. The one new matter asserted is the action of the Sheriff's Deputy in leaning across the counsel table, snapping handcuffs on the defendant's left wrist and saying ''Come on, Pinch.'' This he asserts was an irregularity by which defendant was prevented from having a new trial. No authority is set forth in support of this portion of the assignment.

On page 277, the court had this to say:—

''The Bench at which I am seated is approximately an equal distance from the defendant as the Jury Box. The court wants the record to reflect that at the time the jury was recessed for the noon hour, the court did observe the deputy in charge of the custody of the defendant place the handcuffs upon him. The court did not observe any conduct that at that time was prejudicial. The court heard no comment from the arresting officer to the defendant. The court states that there was no comment made within the hearing of the jury by the officer

in charge of the custody of the defendant which would in any way prejudice him. The jury is aware of the fact that the defendant is under the security of the Sheriff's Department and he is brought to and from the jail daily and during the recess hours. The court will, of course, not tolerate any conduct which will prejudice the rights of the defendant. I want it clearly stated right now, as counsel for the defendant is asserting this position, the court will state it has not observed any matters which were prejudicial and all the matters which counsel alludes to were conducted within the vision of the court. If any orders must be issued henceforth, the defendant may rest assured the court will properly intervene. Motion of defense is overruled. The court finds there was nothing prejudicial to the interests of the defendant conducted by any officer of the Sheriff's Department.''

Under this explanation by the court of what transpired, we are unable to grasp how this action on the part of the Deputy Sheriff affirmatively disclosed that the defendant was prejudiced thereby or was prevented from having a fair trial, or that his substantial rights were materially affected. This portion of the assignment is not well taken. Since we have dealt with the other portions of the assignment in this opinion, the assignment in its entirety must be overruled.

The fifth assignment of error is that the verdict of the jury and the judgment of the court are contrary to law and against the manifest weight of the evidence.

Here appellant is relying on the insufficiency of the evidence adduced (see assignment 2) that this offense took place in the night season. He asserts that a finding that this offense occurred in the night season is against the manifest weight of the evidence.

In this case the evidence is in conflict. The true test is that the evidence to convict must be of such a nature that its character is sufficient to satisfy reasonable minds of the guilt of the defendant. These reasonable minds are those of the jury and not of this reviewing court. Our review discloses there is ample evidence to sustain the conclusion they reached. The jury believed this evidence. Consequently, we cannot find that the evidence is against the manifest weight of the evidence. This assignment is overruled.

See *State* v. *Shively*, 172 Ohio St., 128, 86 Ohio Law Abs., 71, *Sandoffsky* v. *State*, 29 Ohio App., 419, 3 Ohio Jurisprudence (2d), 820 et seq.

Accordingly, we find no substantial errors such as would deny the appellant a fair trial, therefore the judgment of the Common Pleas Court of Ashtabula County must be and hereby is affirmed.

BROWN, P. J., and DONAHUE, J., concurs.