## CIRCUIT COURT OF THE CITY OF ROANOKE

Commonwealth of Virginia

    v.

Gayle Claxton

Commonwealth of Virginia

    v.

Selma Chilous

November 7, 1979

By JUDGE JACK B. COULTER

The defendants filed joint motions on September 24, 1979, to suppress certain evidence allegedly seized in violation of Fourth Amendment rights. An evidentiary hearing on said motions was held on September 26, 1979. Briefs were submitted by the defendants on October 12, 1979, and by the Commonwealth on October 17, 1979.

## Statement of the Facts

Officer S. M. Pendleton of the Roanoke City Police Department was on routine patrol by himself in his patrol car proceeding south in the northeast section of Roanoke at approximately 1:30 a.m. on July 13, 1979, when he observed a parked station wagon headed north on 13th Street about a short block from its T-shaped intersection with Eastern Avenue. Turner Transport is located at the northeast corner of 13th and Eastern and there are other business establishments on Eastern Avenue in the area, which is zoned commercial.

Officer Pendleton's suspicions were aroused when he noted the interior light of the vehicle on and three persons in and around the vehicle. He pulled alongside the driver's side of the parked vehicle. Gayle Claxton came around the vehicle from the back. Pendleton obtained identification from each of the persons, two of them being the defendants in this case: Gayle Claxton and Selma Chilous. The vehicle was a 1970 Dodge station wagon registered to a man whom Miss Claxton claimed was her boyfriend.

Pendleton smelled an odor of kerosine or cleaning fluid and observed its trail for several feet on 13th Street. He saw a blue and white object protruding "a good foot" from the rear of the station wagon, the tail gate being down. It was later identified as a Delco steam generator. It measured three to four feet in length and about $3\frac{1}{2}$ feet in height. Miss Claxton said it belonged to her father. Pendleton, however, being suspicious, radioed for backup units. In about twenty minutes, help came. One of the officers was sent to investigate the businesses in the immediate area to determine if there had been any break-in. He returned shortly to report that he could find none. Pendleton had not heard any reports over his radio of any break-ins or criminal activity in the area. None of the occupants of the station wagon had asked for help; there was no flat tire or lack of any inspection sticker, nor any weapons noted.

Officer Pendleton was then advised that if he could not find any evidence of any crime to release the women. He testified that they had been free to leave before this, but that they had not asked and he had not told them they

could go. Before they left, however, he took the serial number of the generator. To do this, he had to crouch down and use his flashlight, but he did not go into the interior of the wagon. He also scratched his initials and the date on the machine. He did this, he said, in order to be able to identify the generator at a later time if that should become necessary.

Subsequently that evening, within about forty-five minutes, Pendleton went back to the area at 13th Street and Eastern, checked out Turner Transport, discovered that there had been a break-in, alerted the owner who immediately came to his office and, after inspection, advised the officer that a steam generator was missing. Pendleton thereupon proceeded to the Miller Street address that the defendants had given him, which was an apartment complex. There in a parking lot behind or adjacent to the apartment building, Pendleton saw the same 1970 Dodge station wagon he had investigated an hour or so earlier at 13th Street and Eastern. The doors and tail gate were now locked, but Pendleton could still see and identify the steam generator which was partially covered by a blanket, and he could still smell the kerosine and fuel oil.

Other officers arrived and without any arrest warrant, they went to the defendants' apartments, told them they were under arrest and took them to police headquarters. They were placed under arrest between 2:45 and 3:00 o'clock a.m. Subsequently, the station wagon was towed by a wrecker to the city garage and was later opened by some mechanical means other than a key. No search warrant was ever obtained. The steam generator inside the station wagon was returned to Turner Transport where Pendleton later observed it with his initials scratched on it and identified it as the stolen machine.

### The Issues

The facts in this case give unique opportunity to examine anew some of the basic concepts of search and seizure and their Fourth Amendment prohibitions. What is a search and what is a seizure? Rather fundamental notions become threshold inquiries upon which all other questions hang. Did the observation of the steam generator,

in other words, protruding out of the rear of the parked station wagon under the circumstances then and there existing even constitute a search? Did the noting of the generator's serial number and the scratching of the date and the officer's initials thereon, both done without intrusion into the vehicle, even constitute a seizure? If these actions were a search and seizure and were improper, then, in all probability that which thereafter followed, the seizure of the station wagon and the forced removal therefrom of the generator, were tainted, and being fruits of the poisonous tree would be suppressed. On the other hand, if both Officer Pendleton's actions at the scene on 13th Street near Eastern Avenue were valid, then the second issue, the seizure of the station wagon at the apartment parking lot and the subsequent taking of the generator from it, must be explored.

The standing of Selma Chilous, a mere passenger in the station wagon, to complain of the alleged illegal searches and seizures may or may not become material, depending on the resolution of the other issues.

### The Holdings of the Court

The first question to address is whether or not Pendleton's observation of the protruding generator was a "search." The machine was, obviously , in "plain view," which almost automatically triggers talk and thought of the "plain view" exception to warrantless searches enunciated so thoroughly in *Coolidge* v. *New Hampshire*, 403 U.S. 443 (1971). But *Coolidge* and "plain view" require a prior valid intrusion. Here, the officer saw what he saw from a location where he had every right to be. As analyzed in "Search and Seizure: A Treatise on the Fourth Amendment" by Wayne R. La Fave (1978) at p. 242:

> By comparison, the concern here is with plain view in a quite different sense, namely, as descriptive of a situation in which there has been no search at all in the Fourth Amendment sense. This situation, which perhaps is deserving of a different label so as to avoid confusion of it with that discussed in *Coolidge*, encompasses those circumstances in which an observation

is made by a police officer without a prior physical intrusion into a constitutionally protected area. This includes the case in which an officer discovers an object, which has been left in an open field or similar nonprotected area, and also those cases in which an officer -- again, without making a prior physical intrusion -- sees an object on the person of an individual, within premises, or within a vehicle. *In each of these instances there has been no search at all because of the plain view character of the situation, and this means that the observation is lawful without the necessity of establishing either pre-existing probable cause or the existence of a search warrant or one of the traditional exceptions to the warrant requirement.*" (emphasis added)

Furthermore, in seeing the protruding generator, the officer was not even involved in a "search." As defined in 79 C.J.S., *Searches and Seizures*, § 1, the term "search" implies:

some exploratory investigation, or an invasion and quest, a looking for or seeking out. The quest may be secret, intrusive, or accomplished by force, and it has been held that a search implies some sort of force, either actual or constructive, much or little. A search implies a prying into hidden places for that which is concealed and that the object searched for has been hidden or intentionally put out of the way. While it has been said that ordinarily searching is a function of sight, *it is generally held that the mere looking at that which is open to view is not a "search."* (emphasis added)

*See also* 68 Am. Jur. 2d, *Searches and Seizures*, § 23.

Hence, there was no search. But was there a seizure? As Judge Moylan has so colorfully expressed it:

Seeing something in open view does not, of course, dispose, ipso facto, of the problem

of crossing constitutionally protected thresholds. Those who thoughtlessly over-apply the plain-view doctrine to every situation where there is a visual open view have not yet learned the simple lesson long since mastered by old hands at the burlesque houses, "You can't touch everything you can see."

Light waves cross thresholds with a constitutional impunity not permitted arms and legs. Wherever the eye may go, the body of the policeman may not necessarily follow.

Did Officer Pendleton, however, actually "seize" the generator? He touched it, at least those portions that extended outside the vehicle; he took the serial numbers from it; he scratched the date and his initials on it, but do these acts constitute a seizure? La Fave, in his treatise at p. 221, defines seizure as follows:

The word "seizure" in the Fourth Amendment has, in the main, not been a source of difficulty. The act of physically taking and removing tangible personal property is generally a "seizure."

In *Hale* v. *Henkel*, 201 U.S. 43, 26 S. Ct., 370, 50 L. Ed. 652 (1906), the Supreme Court stated that "a seizure contemplates a forcible dispossession of the owner." *See also* 68 Am. Jur. 2d, *Searches and Seizures*, § 8; 79 C.J.S., *Searches and Seizures*, § 1.

In my view, it would be stretching the popular, as well as technical, concept of the word "seizure" to hold that Officer Pendleton's activities constituted "an act of physically taking and removing the property from the owner." He did no such thing; he did not take possession of the generator. He determined the serial number in a less intrusive manner than that approved in *Thims* v. *Commonwealth*, 218 Va. 85 (1977), in which case the officer opened the car door to take down the serial number. The Court held:

Such an investigation when made on public property or property open to the public has been held not to be a search.

The Court accordingly holds that there was neither search nor seizure within the contemplation of the Fourth Amendment when Pendleton observed the generator and marked it for possible future identification.

The second issue, then, concerns the arrest of the defendants and the seizure of the station wagon at the Miller Street Apartments, untainted, as the Court has now held by any preceding illegal search and seizure.

The arrest of the defendants at their apartment without an arrest warrant was clearly justified. By this time Pendleton knew from his own personal knowledge that a break-in had occurred at the Turner Transport Co. within short block of where he had observed the defendants and their station wagon; he now knew that a steam generator had been stolen from Turner Transport; he had seen such a generator in the station wagon that the defendants were driving. He had reasonable grounds or probable cause to believe and suspect that a felony had been committed and that the defendants had participated in the crime. *See* Code Section 19.2-81; *Yeatts* v. *Minton,* 211 Va. 402 (1970); *Crowder* v. *Commonwealth,* 213 Va. 151 (1972); Berry, Arrest, Search & Seizure, pp. 2-3.

The warrantless seizure of the station wagon, the officer having seen again the generator, which he now had probable cause to believe had been stolen, in plain view, even though partially covered by a blanket and now totally within the vehicle, was justified under the exigency (sometimes called automobile) exception to the general rule that warrantless seizures are invalid.

Once contraband was clearly identified within the vehicle (no further "search" was required, it being in plain view), and there being no reasonable doubt about the existence of probable cause, the traditional "exigency" associated with moving vehicle comes into play. The exigency is the mobility of the container, the vehicle with its contents can be quickly and easily removed. *Chambers* v. *Maroney,* 399 U.S. 42, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970), settled the argument that when he driver has been arrested, the exigency has been removed. The *Chambers* rationale holds, in effect, that if the police have the right at curbside, then for convenience's sake the vehicle may be taken to the stationhouse. Even though the driver

and passenger of the station wagon were arrested and could not drive the vehicle away, the owner could, as well as other possible confederates to the crime. The exigency remained. As stated by Judge Moylan in *Bailey* v. *State*, 294 A.2d 123 (1972), excerpts of which are found at page 91 of his publication, "The Right of the People to be Secure":

> The mere placing of a suspect vehicle's occupants in custody does not extinguish exigency, if it otherwise exists.

Or, as stated in *Texas* v. *White*, 423 U.S. 67, 96 S. Ct. 304, 46 L. Ed. 2d 209 (1975):

> In *Chambers* v. *Maroney* we held that police officers with probable cause to search an automobile on the scene where it was stopped could constitutionally do so later at the station house without first obtaining a warrant.

*See also Thims* v. *Commonwealth, supra; Cook* v. *Commonwealth,* 216 Va. 71 (1975); 68 Am. Jur. 2d, *Searches and Seizures,* sect. 45.

For all the reasons aforesaid, the motions to suppress will be denied. There was no search or seizure within the contemplation of the Fourth Amendment when Officer Pendleton first saw the protruding generator on 13th Street near Eastern Avenue and thereafter marked it for purposes of identification. Hence, there was no taint to render invalid the subsequent seizure of the station wagon at the Miller Street apartments. By that time when Pendleton arrived at the apartments he had probable cause to arrest the defendants without a warrant. That probable cause plus the exigent circumstances existing justified the seizure of the station wagon and the subsequent seizure of the clearly visible generator within it some time later at the city garage.

In view of the above rulings, there is no need to consider the question of whether or not Miss Chilous had standing to object.